[Cite as *Mancz v. McHenry*, 2021-Ohio-82.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| BARRY W. MANCZ, FIDUCIARY OF THE ESTATE OF AUDREY KIRBY | : | |
| | : | |
| | : | Appellate Case No. 2019-CA-74 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2015-CV-183 |
| v. | : | |
| | : | (Civil Appeal from |
| CALLISTA McHENRY, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellants | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of January, 2021.

. . . . . . . . . . .

HARRY G. BEYOGLIDES, JR., Atty. Reg. No. 0018959, 130 West Second Street, Suite 1900, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

RICHARD A. BOUCHER, Atty. Reg. No. 0033614 and JULIA C. KOLBER, Atty. Reg. No. 0078855, 12 West Monument Avenue, Suite 200, Dayton, Ohio 45402
        Attorneys for Defendants-Appellants

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Callista and Robert McHenry appeal from the trial court's decision and judgment entry overruling their objections to a magistrate's decision and entering judgment against them for fraudulently conveying real estate and $127,133 in financial assets.

**Factual and Procedural Background**

{¶ 2} The trial court's judgment involves assets that Callista fraudulently conveyed to Robert, her husband, after taking money from her elderly mother for personal use. The record reflects that Callista began serving as attorney-in-fact for her mother, Audrey Kirby, in October 2000. Nearly two years later, Kirby executed a will that provided for her assets to be divided equally among her children, subject to deductions for advances to two children. Kirby also executed a revocable trust agreement. Kirby died in April 2007, leaving 13 surviving children. After one of Kirby's sons resigned as executor of the estate, attorney Barry Mancz was appointed as successor fiduciary.

{¶ 3} In December 2009, Mancz filed a lawsuit in Montgomery County Probate Court, claiming that Callista had breached her fiduciary duties to Kirby's estate by concealing, embezzling, or conveying away estate assets in violation of R.C. 2109.50. Following a hearing, the probate court found Callista guilty of concealing, embezzling, or conveying away estate assets in the amount of $290,975.46. After assessing a 10-percent penalty, the probate court entered judgment against Callista for $320,073.01. On appeal, this court reviewed evidence establishing that while acting as her mother's attorney-in-fact, Callista improperly had moved money from her mother's bank account and certificates of deposit into numerous accounts that were titled in Callista's name or

that were held jointly by Callista and Robert. Callista also obtained certificates of deposit in her own name using her mother's assets. The evidence further established that Callista had written hundreds of checks on these accounts apparently for her personal benefit. Although Callista frequently moved the money she took from her mother, this court's examination of the evidence suggested that she in fact had taken *more* than the amount found by the probate court. This court also rejected an argument that the assets taken by Callista were "gifts" from her mother. Therefore, we affirmed the probate court's judgment against Callista for concealing, embezzling, or conveying away her mother's assets. *See Mancz v. McHenry*, 2012-Ohio-3285, 974 N.E.2d 784 (2d Dist.).

{¶ 4} In his capacity as fiduciary of Kirby's estate, attorney Mancz filed the present lawsuit against Callista and Robert in March 2015. The complaint alleged that Callista had neither satisfied the judgment in the probate-court case nor returned any of the estate property. The complaint further alleged that Callista had transferred her ownership interest in real estate to her husband Robert while litigation was pending against her by her siblings and prior to the probate-court lawsuit brought by Mancz. The complaint alleged that this transfer was made with actual intent to hinder, delay, or defraud Mancz and other creditors and that the transfer was made without Callista receiving reasonably equivalent value in exchange.

{¶ 5} With regard to personal property, the complaint alleged that Callista had transferred, converted, or concealed bank accounts and other financial interests that were recoverable in furtherance of the judgment in the probate-court case. The complaint alleged that these transfers were made with the intent to avoid the purpose of proceedings under R.C. 2109.50 to R.C. 2109.55 (which was the subject of the probate-court action)

"or in contemplation of an examination or complaint provided for by those sections." The complaint alleged that the financial transfers from Callista to Robert were fraudulent and void and that Mancz was entitled to an order compelling the return of any and all such proceeds or the value thereof. The complaint specifically requested a judgment ordering the return of property of Kirby's estate that had been conveyed by Callista to herself, to Robert, or to others. The complaint also sought punitive damages.

{¶ 6} The case proceeded to a January 2019 jury trial presided over by a magistrate. Based on the evidence presented, the jury returned a verdict finding that Callista fraudulently had conveyed her interest in real estate to Robert. The jury also returned verdicts against both Callista and Robert for the fraudulent transfer of Kirby's financial assets. The verdicts were accompanied by numerous interrogatory responses, including interrogatories addressing statutory "badges of fraud." With regard to the fraudulent transfer of financial assets, the jury's verdicts found actual damages of $127,133.

{¶ 7} On January 15, 2019, the magistrate entered a decision on the jury verdicts. The magistrate declared void the deed transferring Callista's interest in real estate to Robert. The magistrate also entered judgment against Callista in the amount of $127,133 and against Robert in the same amount. After holding a hearing, the magistrate declined to impose punitive damages on Callista or Robert.

{¶ 8} The McHenrys subsequently raised five objections to the magistrate's decision on the jury verdicts. In a November 13, 2019 decision and judgment entry, the trial court rejected all but one of the objections. With respect to one objection, the trial court found that the magistrate's decision was unclear as to whether judgment had been

entered against Callista and Robert for $127,133 each. To avoid "double recovery," the trial court clarified that judgment was entered against Callista and Robert jointly and severally for $127,133. The trial court also declared void the deed transferring Callista's interest in the real estate to her husband. Callista and Robert McHenry timely appealed the trial court's judgment, advancing 13 assignments of error.

## Preliminary Issues

{¶ 9} In his appellee's brief, Mancz responds to some of the McHenrys' assignments of error by simply "incorporating by reference" arguments he raised in memoranda and pleadings filed below. In their reply brief, the McHenrys argue that Mancz's extensive reliance on "incorporation by reference" of documents filed in the trial court is inappropriate. Therefore, they urge us not to consider Mancz's arguments that rely on incorporation by reference. Upon review, we agree that wholesale incorporation by reference of arguments raised below is inappropriate and not particularly helpful.[1] We note, however, that the McHenrys' own eleventh assignment of error relies *exclusively* on incorporation by reference of 50 pages of summary-judgment papers they filed in the trial court. Under these circumstances, we will consider the McHenrys' eleventh assignment of error and Mancz's incorporated arguments notwithstanding our disfavor of such an approach.

{¶ 10} For his part, Mancz argues that some of the McHenrys' assignments of error are not properly before us because they are not "addressed by" or "asserted in" the McHenrys' notice of appeal. We find this argument to be unpersuasive. The McHenrys

---

[1] We will address this issue more fully in our analysis of the McHenrys' eleventh assignment of error.

appealed from the trial court's November 13, 2019 Decision and Judgment Entry, which overruled their objections to a magistrate's post-verdict decision and entered final judgment on the jury's verdicts. In our view, the notice of appeal reasonably encompassed the numerous issues and rulings that preceded the trial court's final judgment entry. It was not necessary for the McHenrys to enumerate each of the preceding issues and rulings in their notice of appeal. Having resolved these threshold matters, we turn now to the McHenrys' 13 assignments of error.

**Assignments of Error**

{¶ 11} In their first assignment of error, the McHenrys contend the trial court erred in failing to address their objection to the jury's use of inadmissible evidence to determine damages and to the jury's verdict for the fraudulent transfer of financial assets being against the weight of the evidence.

{¶ 12} This assignment of error concerns the McHenrys fifth objection to the magistrate's decision. Therein, the McHenrys argued that the magistrate had erred in entering judgment on the jury's verdicts with respect to the fraudulent transfer of financial assets. In support, the McHenrys asserted that Mancz (who testified as a witness at trial) never identified a certain dollar amount being transferred from any of the accounts at issue. They claimed that Mancz's only effort to establish a specific dollar amount was through the use of improper demonstrative exhibits during closing arguments. The McHenrys further claimed that Mancz failed to identify any money that Robert spent or withdrew from any of the accounts at issue. In fact, the McHenrys argued that Mancz failed to establish that the money was not still in the accounts to which it was transferred. Without evidence that Robert spent the money or that the accounts had a zero balance,

the McHenrys questioned how the jury could have found a fraudulent transfer. Therefore, they argued in their fifth objection that the jury's verdicts regarding the fraudulent transfer of financial assets were against the manifest weight of the evidence.

{¶ 13} The trial court rejected the fifth objection, reasoning:

In their fifth and final objection, the McHenrys claim there was insufficient evidence to establish a damages award of $127,133 against each of the McHenrys. The McHenrys claim that the jury improperly relied upon a demonstrative exhibit and Mancz's closing argument to come up with the amount of damages awarded.

The Court notes that the jury was instructed that their verdicts must be based upon the evidence. The jury was further instructed that the statements of counsel and closing arguments made by counsel are not evidence. It is well settled that a trial jury is presumed to follow the instructions given to it by the Court. [Citation omitted.]

The McHenrys' fifth objection is not related to any decision made by the Magistrate, but rather a general argument about the jury's verdict that is not appropriate for review on objections. Moreover, the Court presumes the jury followed the instructions given to it by the Magistrate. Therefore, the McHenrys' fifth and final objection is overruled.

(November 13, 2019 Decision and Judgment Entry at 4-5.)

{¶ 14} Upon review, we find the McHenrys' first assignment of error to be without merit. Insofar as they challenged Mancz's use of demonstrative exhibits (which were not introduced into evidence) during his closing argument, the trial court addressed their

objection. The jury was instructed that the demonstrative exhibits were not evidence. Moreover, the trial court noted that the jury was instructed about counsel's statements and closing arguments in general not being evidence. Therefore, regardless of the propriety of the demonstrative exhibits and counsel's related argument, the trial court presumed that the jury followed the instructions given to it and based its verdicts on actual evidence. Regardless of whether the McHenrys agree with the trial court's analysis, the trial court did address that aspect of their fifth objection. Therefore, we do not find that the trial court adopted the magistrate's decision without considering the objection, which is the McHenrys' argument on appeal.

{¶ 15} Insofar as the McHenrys objected to the verdict being against the weight of the evidence, we agree with the trial court that, strictly speaking, "the objection is not related to any decision made by the Magistrate, but rather a general argument about the jury's verdict that is not appropriate for review on objection." If the McHenrys had objected to the magistrate's denying a new-trial motion or denying a motion for judgment notwithstanding the verdict based on the weight of the evidence, then the trial court would have had something to review. But the McHenrys objected to the magistrate *entering judgment* on verdicts that the McHenrys believed were against the weight of the evidence. (June 5, 2019 Supplemental Objections at 13.) The magistrate did not err in simply entering judgment on the verdicts, which were not defective or irregular in any way. In any event, we will address the demonstrative exhibits and the weight of the evidence in our analysis of the McHenrys' sixth assignment of error, where they raise those same issues again. The first assignment of error is overruled.

{¶ 16} In their second assignment of error, the McHenrys contend the trial court

erred in adopting the magistrate's decision where Mancz's fraudulent-transfer claim was barred by res judicata.

{¶ 17} The record reflects that the McHenrys moved for summary judgment, raising issues including res judicata. In particular, they argued that the allegedly fraudulent transfers of the real estate and the money into bank accounts occurred prior to the probate-court lawsuit. Therefore, the McHenrys argued that the fraudulent-transfer claims were required to be brought as part of the probate-court action. The magistrate found res judicata inapplicable, and the McHenrys filed objections. In a September 28, 2018, ruling, the trial court overruled the objection arguing the applicability of res judicata. The trial court reasoned in part:

> While the McHenrys are correct in stating that the present litigation derives from the underlying Montgomery County Probate Court litigation wherein Mancz obtained judgment, the gravamen of the present litigation is based on actions taken by the McHenrys which Mancz maintains were undertaken with "actual intent to hinder, delay or defraud the Plaintiff and other creditors . . ." of Callista McHenry.
>
> Accordingly, the current action is not an attempt to re-litigate a claim or issue litigated and decided in the Montgomery County Probate Court action. Rather, it appears this action has been instituted in an attempt to gain compliance with the Probate Court's order of judgment, which could not have been undertaken prior to the judgment being entered.

(September 28, 2018 Decision and Judgment Entry at 3.)

{¶ 18} In reaching its conclusion, the trial court relied largely on *Blood v. Nofzinger*,

162 Ohio App.3d 545, 2005-Ohio-3859, 834 N.E.2d 358 (6th Dist.). In *Blood*, the Sixth District held that res judicata did not bar a fraudulent-transfer claim brought after the underlying litigation that created a debtor-creditor relationship. Using language that is directly applicable in the present case, the *Blood* court stated: "Litigation that resulted in a judgment and created a judgment-creditor/judgment-debtor relationship is not res judicata as to a subsequent claim that the debtor fraudulently transferred property to avoid paying the judgment. In other words, appellant was not required to add her claim for fraudulent conveyance to litigation that had not yet resulted in a judgment." *Id*. at ¶ 22.

{¶ 19} In their objections to the magistrate's decision, the McHenrys argued that *Blood* was distinguishable because the allegedly fraudulent transfer there did not occur until several years *after* the entry of judgment in the underlying case. (August 21, 2018 Supplemental Objections at 6-7.) The trial court rejected this attempt to distinguish *Blood*. The trial court noted that the McHenrys had misread *Blood*, as the transfer of property at issue in that case had occurred two years *before* the entry of judgment in the underlying litigation. *See Blood* at ¶ 19.

{¶ 20} On appeal, the McHenrys now fail to cite *Blood* under their second assignment of error or even to attempt to address the trial court's reliance on it. Regardless, we find *Blood* to be persuasive and see no error in the trial court's ruling regarding the inapplicability of res judicata. The question is whether the claims in the present case arose from the same transaction, or "common nucleus of operative facts," as the claims in the probate-court case. *Miami Valley Hosp. v. Purvis*, 2d Dist. Montgomery No. 21740, 2007-Ohio-4721, ¶ 11. We agree with the trial court that they did not. The claims in the probate action involved Callista unlawfully removing assets from

her mother's estate. The claims in the present case involve Callista fraudulently conveying those assets to Robert with the intent to hinder, delay, or defraud creditors such as Mancz. Although the two cases are related, they do not share a common nucleus of operative facts such that res judicata precludes the present lawsuit. The second assignment of error is overruled.

{¶ 21} In their third assignment of error, the McHenrys claim the trial court erred in adopting the magistrate's decision permitting testimony from their former attorney, Brian Roberts, despite the fact that his testimony was disclosed without a waiver of the attorney-client privilege.

{¶ 22} This assignment of error concerns attorney Roberts' testimony about the circumstances surrounding his preparation of the deed conveying Callista's interest in the McHenrys' home to her husband Robert. The trial court found that Callista had not waived her attorney-client privilege with regard to this issue. The trial court found that Robert had waived his attorney-client privilege, however, by testifying on cross-examination that the conveyance was done on the "advice of counsel." Although Callista and Robert had met with the attorney together, the trial court allowed attorney Roberts to testify only about his discussion with Robert. Attorney Roberts proceeded to testify among other things that one of the reasons Robert wanted the deed put in his name was "asset protection." (Trial Tr. at 271-272.) According to the attorney, Robert expressed concern about keeping the house out of the reach of creditors in litigation against Callista. (*Id.* at 272-273.) Attorney Roberts explained to Robert that conveying Callista's interest to him would not provide "bullet proof" protection "and that creditors of Callista could claim that that conveyance was inappropriate in an attempt to put assets beyond the reach of her creditors." (*Id.* at

272.) On appeal, the McHenrys argue that Robert's reference to relying on the "advice of counsel" did not waive the attorney-client privilege and, therefore, that attorney Roberts should not have been allowed to testify.

{¶ 23} "The burden of showing that evidence ought to be excluded under the attorney-client privilege rests upon the party asserting the privilege." (Citations omitted) *MA Equip. Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, 980 N.E.2d 1072, ¶ 21 (10th Dist.). " 'In Ohio, the attorney-client privilege is governed by statute, R.C. 2317.02(A), and in cases that are not addressed in R.C. 2317.02(A), by common law.' " *Jackson v. Greger*, 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487, ¶ 7, quoting *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 18. Where the statute applies, the *Jackson* court opined that common-law doctrines involving implied waiver of the privilege are inapplicable. *Id.* at ¶ 11-12. In such a case, the statute provides the only two means by which the privilege may be waived: (1) express consent of the client or (2) the client's voluntary testimony on the same subject. *Id.* at ¶ 12.

{¶ 24} In the present case, Callista explained, as on cross-examination, that she conveyed her interest in the real estate to her husband for privacy and estate-planning purposes. (Trial Tr. at 152-153.) In the course of her explanation, Callista volunteered that she and her husband had consulted a lawyer at the recommendation of a friend. (*Id.*) Mancz then asked what estate-planning purpose Callista believed she would accomplish by conveying her interest to Robert. (*Id.* at 154-155.) In her response, Callista voluntarily referenced her meeting with an attorney. The following exchange then occurred:

> MRS. McHENRY: Okay, I believed, as a result of the meeting with the lawyer that now if Bob were to die before me, then I wouldn't have to go

to Probate. If I were to die before him, he wouldn't have to go to Probate to get his half of the house back. Oh, he wouldn't have to do it because it was in his name. It was me. See, so much has happened, I have to get this straight. That's what I believe.

MR. MANCZ: Did you also believe that by doing this if someone got a judgment against you they wouldn't be able to attach any interest in the property because it was now in your husband's name? Did you believe that?

MRS. McHENRY: I never—that never came up that I recall.

MR. MANCZ: That never came up?

MRS. McHENRY: I don't know. I don't know. As a result of the meeting with the lawyer that's what we did.

MR. MANCZ: Okay. I just want to be clear. Did you believe when the deed was made that you could not get a judgment that would attach anything to your real estate because you gave it to your husband? Did you believe that?

MRS. McHENRY: I didn't do it for that reason.

MR. MANCZ: Did—

MRS. McHENRY: I never thought about it. I never thought about it.

(*Id.* at 155-156.)

{¶ 25} Following Callista's testimony, Mancz asserted during a bench conference that she had perjured herself. (*Id.* at 161.) Specifically, Mancz claimed Callista had lied when she testified that the possibility of someone attaching her assets was not a reason for conveying her interest in the real estate to her husband. Mancz argued that evading

creditors was her primary purpose, and he sought to call attorney Roberts to prove it. (*Id.* at 161.) The McHenrys' counsel objected, arguing that Callista's attorney-client privilege precluded Mancz from calling attorney Roberts to prove perjury. (*Id.*) The trial court responded that the matter was "an issue that we'll have to look into." (*Id.* at 162.) Mancz agreed to call Callista's husband Robert first, and the trial court indicated that "we'll talk about [the alleged perjury] during the break."[2] (*Id.*)

{¶ 26} Robert then testified as on cross-examination. Mancz first asked whether Robert gave Callista anything in exchange for her interest in the real estate. Robert responded that he did give Callista something. Citing attorney-client privilege, however, Robert refused to identify what consideration he gave Callista. (*Id.* at 233-236.) Mancz then asked whether Robert signed any other documents at the time of the deed conveyance. Robert refused to answer, citing attorney-client privilege. (*Id.* at 237.) Robert also denied having heard Callista testify the previous day that she never considered attempting to protect the house from attachment by creditors. (*Id.* at 238.)

{¶ 27} Mancz then asked Robert whether part of the reason he consulted an attorney was because of the pending claims against Callista. Defense counsel objected on the basis of attorney-client privilege. (*Id.* at 239.) The trial court overruled the objection, finding that the reason why Robert went to see an attorney was not protected. (*Id.* at 239-240.) Mancz then asked again whether part of Robert's reason for seeing an attorney and having the deed conveyed "was to keep creditors of your wife from attaching the property should they get a judgment on their claim[.]" (*Id.* at 240.) Robert responded that it was

---

[2] The record contains no other discussion of the perjury issue. If it was addressed again, the trial court dealt with it off the record.

not. (*Id.*) Mancz then asked what did prompt Robert to see the attorney. Robert responded: "Without violating my attorney client privilege there were several reasons." Robert proceeded to cite privacy concerns related to the lawsuit against his wife and various pieces of personal information being disseminated on the internet. (*Id.* at 240-241.) In response, Mancz asked what that had to do with Callista conveying away her interest in the real estate. Robert initially refused to answer, citing attorney-client privilege. (*Id.* at 241.) When Mancz persisted and asked again, Robert responded, "We consulted a lawyer and followed his advice." (*Id.* at 242.)

{¶ 28} Following Robert's testimony, Mancz sought to call attorney Roberts as a witness. (*Id.* at 243.) The McHenrys' counsel objected on the basis of attorney-client privilege. (*Id.* at 244.) Counsel also argued that Robert's reason for consulting counsel and wanting the property conveyed to him was irrelevant because it was Callista's intent in conveying away her interest in the property that was critical. (*Id.* at 245.) Mancz responded that Robert's intent was relevant because he too signed the deed conveying the property from both of the McHenrys to him alone and Mancz sought to hold him responsible for the fraud too. (*Id.* at 249.)

{¶ 29} The trial court held the relevance objection in abeyance because it did not know what attorney Roberts would say. As for the attorney-client privilege, the trial court held that Robert had waived it based on his testimony about relying on the advice of counsel. (*Id.* at 250.) In support, the trial court cited *Maddox v. Greene Cty. Bd. of Commrs.*, 2d Dist. Greene No. 2013-CA-71, 2014-Ohio-1541. (*Id.*) Based on its finding that Callista did not waive her attorney-client privilege, the trial court limited attorney Roberts to testifying only about his communication with Robert. (*Id.* at 250-251.) As set

forth above, attorney Roberts then testified that Robert expressed concern about asset protection and shielding the house from creditors in the litigation against Callista.

{¶ 30} Following the jury's verdict in favor of Mancz on behalf of the estate, the trial court overruled the McHenrys' objection to the magistrate's decision allowing attorney Roberts to testify. In support of its decision, the trial court reasoned:

> Under R.C. section 2317.02(A), if a client voluntarily testifies about communications made to his or her attorney, then that attorney can be compelled to testify about the same subject. Courts have interpreted "the same subject" broadly. *Walsh v. Barcelona Associates, Inc.*, 16 Ohio App.3d 470 (1984). Voluntarily testifying that one acted on the advice of counsel constitutes an implied waiver of the attorney-client privilege. *Meyers Roman Friedberg & Lewis* [*v. Malm*], 183 Ohio App.3d 195, 2009 Ohio 2577. Indeed, one "cannot manipulate the attorney-client privilege by unilaterally choosing to disclose information favorable to him, while concurrently seeking to bar the search for potentially unfavorable information." *Id.* at ¶ 61.

> In this case and without objection, the question was posed, "[w]hat was the reason that you had your wife convey her interest—or, your wife convey her interest to you with a transfer on death back to you? . . . Or back to her—excuse me." Robert McHenry testified, "[w]e consulted a lawyer and followed his advice." (TR Volume IV, p. 242). He voluntarily asserted that the deed transfer was done on the advice of counsel as the answer to the question. Given the authority cited above, this Court finds an implied waiver

of the attorney-client privilege, and given the broad interpretation of "the same subject," this Court finds that Brian Roberts's testimony was on the same subject as that of Robert McHenry. The Magistrate did not err in allowing the testimony of Brian Roberts as a result of that implied waiver. Moreover, the Magistrate properly limited Roberts's testimony to exclude any references to communications with or by Callista McHenry. The McHenrys' first objection is overruled.

(November 13, 2019 Decision on Objections at 2.)

{¶ 31} Upon review, we disagree with the trial court's determination that Robert voluntarily waived his attorney-client privilege. The trial court found the statutory privilege under R.C. 2317.02(A) applicable but concluded that Robert implicitly had waived it by relying on an advice-of-counsel defense. A voluntary assertion of an advice-of-counsel defense can be deemed as a voluntary waiver, although in *Matter of Estate of Weiner*, 2019-Ohio-2354, 138 N.E.3d 604, ¶ 65 (2d Dist.), we recently stated, without analysis, that "[t]he statutory attorney-client privilege may be waived only expressly, and not by implication[.]" Here though we conclude the record does not support the trial court's conclusion that Robert "voluntarily" waived the privilege "without objection." Just before answering the question at issue, Robert *explicitly* objected by invoking his attorney-client privilege and refused to answer. (Trial Tr. at 241-242.) Only after opposing counsel persisted did Robert answer. (*Id.*) In fact, we note that Robert attempted to invoke his attorney-client privilege at virtually every turn when discussing the deed conveying the real estate and the meeting with an attorney even though we believe the privilege did not apply to questions about what his own intentions were in transferring the real estate to

Callista. We note too that Robert answered the specific question at issue as on cross-examination. Under Ohio law, "there is at least a presumption that statements made during cross-examination are not voluntarily." *Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-CV-399, 2013 WL 3778922, at *7-8 (S.D. Ohio July 18, 2013) (Citing cases.) "[A] party claiming that the attorney-client privilege has been waived may overcome that presumption by pointing to the cross-examined party's unprompted disclosure of privileged communications, affirmatively offered, to which the examined party or their counsel did not object." *Id*. Here Robert did not make an unprompted disclosure of his communications with his attorney. He mentioned acting on the advice of counsel in response to repeated questioning by opposing counsel and only after invoking his attorney-client privilege and initially refusing to answer. Under these circumstances, we believe Robert did not voluntarily waive his attorney-client privilege.

{¶ 32} This court's decision in *Maddox*, on which the magistrate relied at trial, is not to the contrary. In *Maddox*, we found a waiver of the attorney-client privilege where the party seeking to invoke the privilege voluntarily had raised "advice of counsel" as an affirmative defense in its answer. Under Ohio law, acting on the "advice of counsel" is a recognized affirmative defense to certain civil claims. *See*, *e.g.*, *Kleemann v. Carriage Trace, Inc.*, 2d Dist. Montgomery No. 21873, 2007-Ohio-4209, ¶ 63. To establish the advice-of-counsel defense, a defendant is required to prove that he sought the advice of counsel, that he fairly and impartially informed his attorney of all material facts, and that he followed his attorney's advice in good faith. *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d 163, 168, 499 N.E.2d 1291 (10th Dist.1985). In *Maddox*, we found that the defendant had chosen to make a voluntary assertion in its answer that it had acted on the

advice of counsel. *Maddox* at ¶ 11. Therefore, the attorney-client privilege was waived with respect to that advice. One should not be able to claim they acted on advice of counsel without exposing what that advice entailed.

{¶ 33} Here the McHenrys did not assert an advice-of-counsel affirmative defense, which would have meant that they admitted conveying the real estate with fraudulent intent but did so in good faith because their attorney recommended that course of action. *See State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 75 Ohio St.3d 31, 33, 661 N.E.2d 187 (1996) (recognizing that an affirmative defense is "a new matter [that], assuming the complaint to be true, constitutes a defense to it"). Nor did Robert McHenry *voluntarily* choose to assert that he had acted on the advice of counsel. Unlike the defendant in *Maddox*, he made that disclosure as on cross-examination and after repeatedly invoking his attorney-client privilege. Therefore, we find *Maddox* to be distinguishable.

{¶ 34} Despite the foregoing conclusion, we see no grounds for reversing the trial court's judgment on the attorney-client privilege issue. Although Mancz has not raised the issue on appeal, we note that Callista very well may have waived her own attorney-client privilege notwithstanding the trial court's conclusion to the contrary. When asked about an affidavit in which she claimed to have conveyed the real estate to Robert for privacy and estate-planning purposes, Callista voluntarily mentioned going with Robert to see a lawyer. (Trial Tr. at 152-153.) When asked what estate-planning purpose she was accomplishing, Callista again voluntarily referenced her attorney reviewing the deed. (*Id.* at 154.) When asked again about what estate-planning purpose she was accomplishing by conveying her interest to Robert, Callista responded that, as result of her meeting with

an attorney, she believed neither she nor Robert would have to go through probate if the other died. (*Id.* at 155.) When asked whether she also believed as a result of the meeting that putting the house in her husband's name would shield it from creditors, Callista responded without objection that she did not believe that issue ever came up, that she did not convey the real estate for that reason, and that she never thought about protecting the house from creditors. (*Id.* at 156.) By asserting without objection that protecting the real estate from potential claims from creditors never came up during the meeting with an attorney, Callista likely waived her attorney-client privilege regarding the substance of the meeting. *Compare Selby v. O'Dea*, 2020 Ill.App. (1st) 181951, __ N.E.3d __, 2020 WL 1548471, ¶ 185-191 (holding that a client waived the attorney-client privilege when discussing the content of attorney-client communications by disclosing what such communications *did not* contain); *Terry v. Bacon*, 2011 Utah App. 432, 269 P.3d 188, ¶ 19 ("[T]he Terrys should not be permitted to use the [attorney-client] privilege as a sword by relying on their statements about what was not said during the communications with former counsel, while also asserting the attorney-client privilege as a shield when the defendants attempt to refute those assertions."). Allowing a party to testify concerning the substance of an attorney-client communication without allowing the attorney to respond would violate the principle that "the attorney-client privilege is a shield, to protect the confidentiality of a client's consultation with her attorney, not a sword to facilitate perjury concerning the substance of counsel's advice." *State v. Houck*, 2d Dist. Miami No. 09-CA-08, 2010-Ohio-743, ¶ 38. But even setting aside the issue of Callista's potential waiver, we see no basis for reversing the trial court's judgment with regard to the attorney-client privilege issue.

{¶ 35} It is apparent to us that the attorney-client privilege never attached to Robert's conversation with attorney Roberts in the first place. "[I]t is beyond contradiction that the privilege does not attach in a situation where the advice sought by the client and conveyed by the attorney relates to some future unlawful or fraudulent transaction. Advice sought and rendered in this regard is not worthy of protection, and the principles upon which the attorney-client privilege is founded do not dictate otherwise." (Citations omitted.) *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 661, 1994-Ohio-324, 635 N.E.2d 331 (1994). "[T]he attorney-client privilege exists to aid in the administration of justice and must yield in circumstances where justice so requires." *Id*; *see also Hayes v. Lindquist*, 22 Ohio App. 58, 63, 153 N.E. 269 (6th Dist.1926) (finding that testimony about a conversation between a client and his attorney was not protected by the attorney-client privilege where it concerned a discussion of the client fraudulently conveying stock to his sister, as the testimony "related to proposed future wrongdoing on the part of the client").

{¶ 36} Here attorney Roberts' testimony indisputably supported a finding that Robert McHenry sought and obtained legal advice related to a fraudulent transaction, namely the fraudulent conveyance of Callista's interest in their home to shield it from creditors in the litigation against her. Under these circumstances, no attorney-client privilege attached to Robert's conversation with his attorney. Although the trial court did not rely on this rationale, "[r]eviewing courts affirm and reverse judgments, not reasons." *State v. Rubes*, 2012-Ohio-4100, 975 N.E.2d 1054, ¶ 33 (11th Dist.); *see also Joyce v. Gen. Motors Corp.*, 49 Ohio St. 3d 93, 96, 551 N.E.2d 172 (1990) (noting that "a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as the basis thereof"). For the foregoing reasons, we overrule the

McHenrys' third assignment of error.

{¶ 37} In their fourth assignment of error, the McHenrys assert that the trial court erred in adopting the magistrate's decision overruling their motion for a mistrial. This assignment of error is predicated on an assumption that the testimony of attorney Roberts was inadmissible. Based on our resolution of the third assignment of error, however, we conclude that attorney Roberts properly was allowed to testify. We note too that the motion for a mistrial itself was prompted by the McHenrys' counsel's own questioning of attorney Roberts. Before allowing Roberts to testify, the trial court carefully limited him to discussing his conversations with Robert without mentioning anything about Callista. When the McHenrys' counsel subsequently questioned attorney Roberts, the following exchange occurred:

MR. BOUCHER: Okay. And, just so I'm clear, did you ever meet independently with Mr. McHenry?

MR. ROBERTS: Not that I recall.

MR. BOUCHER: Okay. So, everything you've just testified to you did with both Mr. and Mrs. McHenry, correct?

MR. MANCZ: Objection.

THE COURT: Approach.

(BENCH CONFERENCE)

Mr. BOUCHER: We're going for a mistrial. This is—this is way over the line. It's absolutely a mistrial. She was going to . . .

(CROSS TALK)

THE COURT: It's not appropriate for you to ask that question.

MR. MANCZ: That's correct.

MR. BOUCHER: Well, we're having a mistrial because there's an inference to the jury now: Did he ever meet independently with Bob? Not to my recollection. So, now the jury knows that he met with both of them and that the conversations that Bob had with him were in front of Callista. We have a mistrial. * * *

(Trial Tr. at 276-277.)

{¶ 38} Although the jury perhaps may have been able to infer that Callista was present when her husband Robert spoke with attorney Roberts, that fact had not been highlighted or clearly established prior to the McHenrys' counsel's own questioning. By directly asking attorney Roberts whether Callista and Robert were both present—a question the trial court correctly found inappropriate under the circumstances—the McHenrys' counsel magnified the potential for the prejudice about which he now complains. Under these circumstances, the trial court did not abuse its discretion in declining to declare a mistrial. The fourth assignment of error is overruled.

{¶ 39} In their fifth assignment of error, the McHenrys argue that the trial court erred in adopting the magistrate's decision overruling their motion for a directed verdict. The record reflects that the McHenrys orally moved for a directed verdict at the conclusion of Mancz's case, raising numerous arguments. (Trial Tr. at 493-513.) On appeal, the McHenrys argue that the trial court erred in overruling their motion with respect to several of those arguments.

{¶ 40} The McHenrys first contend they were entitled to a directed verdict with regard to the allegedly fraudulent transfer of real estate because Mancz "never

established through testimony that there was a transfer of real estate, what the date of the alleged transfer of real estate was, whether any deed was recorded, whether both parties were aware of the deed, executed the deed, etc." (Appellants' Brief at 14-15.) The McHenrys assert that the only testimony about the real estate came from their former attorney, Brian Roberts. In addition to arguing that his testimony should have been disallowed on the basis of privilege, the McHenrys contend that Roberts "did not testify as to the validity of the deed, whether it was recorded, whether it was executed, etc." (*Id.* at 15.)

{¶ 41} The McHenrys also argue that a directed verdict was appropriate based on Callista's testimony that the real estate was not transferred until after she heard that a 2007 Greene County case against her by her siblings was going to be dismissed. Although the trial court found an inference of fraudulent intent based in part on the 2007 case remaining pending when the real estate was transferred on June 2, 2008, the McHenrys claim there was no testimony about June 2, 2008 being the date of transfer.

{¶ 42} The McHenrys further assert that Callista's siblings in the 2007 case never became her "creditors" for purposes of a fraudulent transfer because the 2007 case ultimately was dismissed. The McHenrys also suggest that Mancz was not a "creditor" in the 2007 lawsuit in which he did not participate. Therefore, they contend the real estate transfer could not have been fraudulent as to him.

{¶ 43} The McHenrys next assert that they were entitled to a directed verdict based on their belief that some of the statutory "badges of fraud" did not apply. In particular, they assert (1) that Callista was not insolvent at the time of the real-estate transfer, (2) that she received "value" from Robert for the real-estate transfer, and (3) that there was no

concealment of any transfer of real estate or money. The McHenrys also argue that Callista remained in control of all of the money at issue and made all withdrawals. They argue that Robert never spent any of the money or made any withdrawals despite the fact that some of the disputed funds were placed in joint accounts in his and Callista's name.

{¶ 44} Because a motion for a directed verdict presents a question of law, we apply de novo review. *Goodyear Tire Co. v. Aetna Casualty & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4. A directed verdict is proper if, construing the evidence most strongly in favor of the non-moving party, the trial court "finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4). This test "requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear* at ¶ 3.

{¶ 45} With the foregoing standards in mind, we conclude that the McHenrys have not demonstrated error in the ruling on their directed-verdict motion. Their first argument about a lack of evidence establishing any transfer of real estate is arguably frivolous. Counsel for the McHenrys began his directed-verdict argument by *admitting* "the fact" that Callista signed the deed conveying her interest in the real estate to Robert on June 2, 2008. (Trial Tr. at 493-494.) The McHenrys also ignore Planitiff's Exhibit 3, a copy of the June 2, 2008 warranty deed transferring the real estate from Callista and Robert jointly to Robert alone. The recorded deed signed by the McHenrys was referenced multiple times during Mancz's case-in-chief, and it was admitted into evidence *without objection* by the McHenrys' counsel. (Trial Tr. at 435.) Finally, Robert testified and acknowledged that he and his wife executed the deed on June 2, 2008 conveying the marital residence from

them jointly to him. (*Id.* at 164.) In short, the existence of the real-estate conveyance was not disputed below. The McHenrys' current argument to the contrary is devoid of any factual support.

{¶ 46} We also reject the McHenrys' argument that they were entitled to a directed verdict based on Callista's testimony that the real estate was not transferred until after she heard that the 2007 Greene County lawsuit brought by her siblings was going to be dismissed. The fact remains that the Greene County lawsuit had not been dismissed when Callista and Robert conveyed their home to Robert alone. Callista admitted that claims were pending against her when the transfer occurred. (*See, e.g.*, Trial Tr. at 150.) Moreover, the expectation was that the 2007 case brought by the siblings, as individuals, would be dismissed because it was anticipated that Mancz would pursue a separate lawsuit acting as a fiduciary on behalf of the estate, to recover the same assets of Audrey Kirby that Callista had taken, which is exactly what occurred. Construing the evidence in a light most favorable to Mancz, we are unpersuaded that Callista's testimony about the anticipated dismissal of her siblings' lawsuit supported a directed verdict in the McHenrys' favor.

{¶ 47} We are equally unpersuaded by the McHenrys' argument that there could not have been a fraudulent transfer because neither Callista's siblings nor Mancz qualified as a "creditor" when the real estate was transferred. Under R.C. 1336.04(A)(1), a transfer made by a "debtor" may be fraudulent as to a "creditor" whether the creditor's claim arose before or within a reasonable time not to exceed four years after the transfer. A "claim" means a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

equitable, secured, or unsecured." R.C. 1336.01(C). A "creditor" means a person who has a claim, R.C. 1336.01(D), and a "debtor" is a person who is liable on a claim. R.C. 1336.01(F).

{¶ 48} At the time of the real estate transfer, Callista's siblings and Audrey Kirby's estate had a disputed right to payment that had not been reduced to judgment. In fact, the Greene County case brought against Callista by the siblings was pending at that time. Therefore, they had a "claim" against Callista. Perhaps more importantly for present purposes, when he initially became involved as a fiduciary on behalf of Audrey Kirby's estate, Mancz also had a "claim" because he had at least a disputed right to payment. Following the June 28, 2011 probate-court judgment that Mancz obtained on behalf of the estate, he also had a right to payment that had been reduced to judgment. We note too that he filed his original complaint in this case in May 2012, which was less than four years after the allegedly fraudulent real-estate transfer at issue. In any event, contrary to the implication of the McHenrys' appellate brief, it matters not whether Mancz qualified as a "creditor" when the real-estate transfer was done. *Prouse, Dash & Crouch, L.L.P. v. DiMarco*, 175 Ohio App.3d 467, 2008-Ohio-919, 887 N.E.2d 1211, ¶ 48 (8th Dist.). "Rather, anyone who now has a claim against a party and alleges that the transfer was done fraudulently to elude other creditors or obligations may step in and declare that the transfer was done fraudulently. The plain language of R.C. 1336.04 clearly provides that the claim of the creditor can arise after the transfer of the property." *Id.*

{¶ 49} We also find no merit in the McHenrys' argument that they were entitled to a directed verdict because a few of the statutory "badges of fraud" did not apply here. Specifically, the McHenrys claim Callista was not insolvent at the time of the real-estate

transfer, she received "value" from Robert for the real-estate transfer, and there was no concealment of any transfer of real estate or money.

{¶ 50} Under R.C. 1334.06(A), a transfer made by a debtor is fraudulent if the transfer is made (1) "with actual intent to hinder, delay, or defraud any creditor of the debtor" or (2) without receiving a "reasonably equivalent value" where additional circumstances exist. To determine actual intent, R.C. 1334.06(B) identifies 11 non-exclusive factors or "badges of fraud" to consider. Three of those actual-intent factors are whether the value received by the debtor was reasonably equivalent to the value of the asset transferred, whether the debtor was insolvent or became insolvent shortly after the transfer, and whether debtor removed or concealed assets. The McHenrys argue that these factors do not apply here.

{¶ 51} Having reviewed the record, we do not agree that Callista received "value" (and certainly not "reasonably equivalent value") from Robert in exchange for transferring her interest in their home to him. The McHenrys argue that this "value" consisted of Robert making the mortgage payments. Construing the evidence most strongly in favor of Mancz, however, Robert made these payments both before and after the real-estate transfer using money that he earned while married to Callista, who was not employed outside the home. The record does not compel a finding that Robert made the mortgage payments in exchange for Callista's conveying her interest in the real estate to him. We note too that jury interrogatories establish the jury's finding that Callista did not receive reasonably equivalent value in exchange for the transfer.

{¶ 52} Whether Callista concealed or removed assets is a closer question, as is the question of whether the transfers at issue rendered her insolvent. In answers to

interrogatories, the jury found with regard to the real estate that Callista did not remove or conceal assets, perhaps because the recorded deed was a matter of public record, but they did conclude the transfer rendered her insolvent. (*See* January 11, 2019 Jury Interrogatories.) With regard to financial assets, the jury found that Callista did conceal her transfers, that she concealed or removed assets, and that the transfers rendered her insolvent. (*Id.*) But even if we assume, arguendo, that the two badges of fraud pertaining to concealing or removing assets and insolvency do not apply, the McHenrys' argument fails to establish their entitlement to a directed verdict.

{¶ 53} In their assignment of error, the McHenrys fail to address the other badges of fraud, a number of which Mancz's evidence supported. The existence of as few as three of the badges of fraud has been held to constitute clear and convincing evidence of fraudulent intent. *William E. Weaner & Assocs., LLC v. 369 West First, LLC*, 2d Dist. Montgomery No. 28399, 2020-Ohio-48, ¶ 60. With regard to the real estate, the jury found among other things, and Mancz's evidence supported, that Callista's transfer was to an insider, she retained possession or control of the real estate, she had been sued or threatened with suit before the transfer, and she did not receive reasonably equivalent value. With regard to financial assets, the jury found, among other things, and Mancz's evidence supported, that Callista's transfer(s) were to an insider, she had been sued or threatened with suit before the transfer(s), the transfer(s) were of substantially all of her assets, she did not receive reasonably equivalent value, and the transfer(s) occurred before or shortly after a substantial debt was incurred. Mancz's evidence on all of the foregoing issues under R.C. 1334.06(A) was enough to overcome the McHenrys' directed-verdict motion.

{¶ 54} In their final argument, the McHenrys suggest that Callista remained in control of all of the financial assets at issue despite Robert's name being on accounts. They argue that Robert never spent any of the money or made any withdrawals. The issue, however, was whether Callista fraudulently *transferred* the money, not whether Robert actually used it. In fact, Callista's claim that she retained control over all of the money despite Robert's name being on accounts was another badge of fraud against her under R.C. 1336.04(B)(2), which the jury also found applicable. For the foregoing reasons, we overrule the fifth assignment of error.

{¶ 55} In their sixth assignment of error, the McHenrys contend the trial court erred in adopting the magistrate's decision entering judgment on verdicts that were against the weight of the evidence, based on inadmissible statements and demonstrative evidence presented during closing arguments, and based on speculative damages.

{¶ 56} More specifically, the McHenrys assert that Mancz never testified as to a specific dollar amount he believed was fraudulently transferred. They also claim Mancz failed to establish that Robert spent or withdrew any of the money Callista transferred to him. In fact, the McHenrys claim Mancz failed to establish that the transferred money no longer remained in the accounts at issue. They further argue that the jury was forced to speculate about what amounts were transferred, what Robert may have spent, what remained in the accounts, and whether any transfers were fraudulent. To support their argument, the McHenrys cite testimony about Callista transferring $22,085.15 into a Huntington Bank account. They contend that Robert was not asked anything about this transfer other than the fact of its existence. In particular, they argue that Mancz failed to "ask about anything else, including withdrawals, joint owners, signature cards, remaining

balances, expenditures, current balance, etc." (Appellants' Brief at 19.) They further argue that Mancz failed to establish "a single badge of fraud" with regard to the Huntington Bank account. They also claim Mancz "never contested" Robert's claim that he gave the money in the Huntington Bank account "back to Mrs. McHenry." (*Id.*) Finally, with regard to the damages calculation, the McHenrys argue as follows:

> * * * In addition to the $22,085.00 mentioned above, the remainder of the award by the jury was made up of the following figures: $35,000.00, $59,025.00 and $11,023.00. A review of the transcript will demonstrate that there was no actual evidence represented or elicited that established anything fraudulent about those figures/accounts or that established who utilized the money, where the money sits currently, or that refuted the return of the funds to Mrs. McHenry. Appellee did not meet his burden, plain and simple. In an effort to make up for that, Appellee provided the jury a list of the amounts that he wanted to be awarded, an exact match to the four mentioned above. The jury appears to have lost their way and instead of stating that Appellee failed to meet his burden, they rather took his "testimony" made during closing arguments and awarded judgment without actually having seen or heard any evidence to support the numbers he recited to them.

(*Id.* at 19-20.)[3]

---

[3] The jury's award of $127,133 consists of the balances at various times from four accounts: 1) $22,085 (precisely $22,085.15) resulting from a transfer from Callista's Liberty Savings CD #3780 to a Huntington account #9184 in Robert's name only on May 19, 2009. (Trial Tr.143-144, 200-201 & Exhibits 25 and 32); 2) $35,000 in Callista's Chase Bank account #1411 which was transferred to her and Robert's joint names on July 9, 2008, (Trial Tr. 100, 105, 119, 187 & Exhibit 17); 3) $11,023 [precisely $11,023.56] that

{¶ 57} In civil and criminal cases alike, a judgment will be reversed as being against the manifest weight of the evidence only in an exceptional case in which the evidence weighs heavily against the judgment. *Amesse v. Wright State Physicians, Inc.*, 2018-Ohio-416, 105 N.E.3d 612, ¶ 46 (2d Dist.) (noting that the same manifest-weight standard of review applies in civil and criminal cases). Here we conclude that the weight of the evidence was not contrary to the jury's verdict.

{¶ 58} Although Mancz did not testify as to a specific dollar amount that he believed was fraudulently transferred, he presented the jury with bank records and other evidence from which it was able make that determination on its own. We are equally unpersuaded by the McHenrys' repeated argument about a lack of evidence that Robert ever withdrew or spent any of the money Callista transferred to him. The McHenrys fail to explain how or why this made any difference to the fraudulent-conveyance claims. The trial court correctly instructed the jury that a fraudulent conveyance required proof that "Callista McHenry fraudulently transferred assets to Robert McHenry[.] (Trial Tr. at 647.) Under R.C. 1336.04, Mancz was not required to prove that Robert, the transferee, did anything in particular with the transferred assets. Rather, upon proof of a fraudulent transfer, a creditor is entitled, among other things, to a judgment against the transferee for the value of the asset transferred or the amount of the creditor's claim. R.C.

---

was the balance after Callista deposited $11,000 on November 20, 2008 into Chase Bank account #1034, a joint checking account held by Robert and Callista. (Trial Tr. 190-192, Exhibit 17.); and 4) $59,025 (precisely $59,025.42) representing the closing balance of PNC account 0500. A National City(4833)/PNC(0500) account had been funded from the closing of Liberty Savings account #3705 that was opened solely in Callista's name. (Trial Tr. 90, 93, 97,197-198, and Exhibits 10 and 15.) We provide more detail for this last account in resolution of the Seventh Assignment of error. The rounded total of the four accounts is $127,133.

1336.08(B)(1)(a).

{¶ 59} We also reject the McHenrys' argument that "the jury was forced to speculate about what amounts were transferred, what Robert may have spent, what remained in the accounts, and whether any transfers were fraudulent." Again, Mancz was required to prove only that Callista made fraudulent transfers to Robert. Mancz presented numerous bank documents establishing the existence of transfers, and the record was replete with circumstantial evidence from which the jury reasonably could have inferred that Callista made the transfers with fraudulent intent.

{¶ 60} Under their assignment of error, the only specific transfer the McHenrys address involves the $22,085.15 balance in the Huntington Bank CD account.[4] The record reflects that Callista had multiple Liberty Savings Bank CDs that she had funded with money wrongfully obtained from her mother's estate. (Trial Tr. at 143-145.) Robert testified that the Huntington Bank account was funded when Callista closed one of the Liberty Savings Bank CDs and deposited that money into the Huntington Bank CD account, which was in Robert's name alone. This testimony from Robert established a "transfer" from Callista to him. Plaintiff's Exhibit 25, which was admitted into evidence without objection (*Id.* at 454-457.), further demonstrated that the Huntington Bank CD account had been opened in May 2009 with Robert's name alone appearing on a signature card. Given the timing and other circumstances of this transfer from Callista to Robert involving money obtained from her mother's estate, the jury could have reasonably inferred the existence of fraudulent intent by Callista.

---

[4] The McHenrys refer to the transfer being $22,085.00, but the record reflects that it more precisely was $22,085.15. (*See* Plaintiff's Exhibit 25.)

{¶ 61} Despite the McHenrys' argument, we see nothing significant in Mancz's failure to inquire about "withdrawals, joint owners, signature cards, remaining balances, expenditures, [or] current balance" with regard to the Huntington Bank account. Once again, Plaintiff's Exhibit 25 was admitted into evidence without objection from the McHenrys. That exhibit showed deposits, withdrawals, and the remaining balance. It also included a signature card bearing Robert's name alone, indicating that it was not a joint account, which Robert himself confirmed. The bottom line is that Mancz proved a transfer from Callista to Robert into the Huntington Bank CD account, and the jury reasonably inferred the existence of fraudulent intent. As for Robert's unsubstantiated claim that he gave the money at issue "back" to Callista, the jury was free to disbelieve him when assessing witness credibility. Therefore, that aspect of its verdict was not against the manifest weight of the evidence.

{¶ 62} The McHenrys' final argument of this assignment challenges other aspects of the jury's damages award. Specifically, they address other transfers involving the $35,000, $59,025, and $11,023 and assert "that there was no actual evidence represented or elicited that established anything fraudulent about those figures/accounts or that established who utilized the money, where the money sits currently, or that refuted the return of funds to Mrs. McHenry." (Appellants' Brief at 20.)

{¶ 63} In our view, the record supported a finding that the disputed accounts were funded with money Callista improperly obtained from her mother's estate. In July 2008, the $35,000 was transferred from an account solely in Callista's name into a joint Chase Bank CD account with Robert. (Trial Tr. at 119-123, 187.) In November 2008, the $11,000 was deposited by Callista into a joint Chase Bank checking account held jointly by Robert

and Callista. (Plaintiff's Exhibit 17.) The probate court determined that Callista opened a Liberty Savings CD in her sole name on May 3, 2007, shortly after Kirby's death, with $54,188.96 that was the remaining balance of a Bank One CD that had been purchased years earlier with Kirby's money. (Plaintiff's Exhibit 10, pg. 16-17.) The proceeds were eventually deposited or converted to joint accounts in both of the McHenry's names. The record supported a finding that Callista lacked sufficient assets to make such deposits with her own money. Aside from the assets that she took from her mother's estate, she had an IRA account, but she never moved the IRA money anywhere. (*Id.* at 190-192.) Callista was not employed at the time, and she actually *admitted* transferring money to Robert, either jointly or individually, from her mother's estate through the end of 2008. (*Id.* at 110, 112-113, 141-142.) Under these circumstances, the jury reasonably could have inferred that the $35,000 transfer, the $11,000 deposit, and the changing into their joint names the account that became $59,025 were fraudulent transfers. Accordingly, the sixth assignment of error is overruled.

{¶ 64} In their seventh assignment of error, the McHenrys more specifically argue that the funds with regard to the $59,025 portion of the judgment appear to have been transferred from a joint account belonging to Callista and Robert into another joint account belonging to Callista and Robert. They contend the trial court erred in upholding a jury verdict finding that a transfer of assets from one joint bank account to another joint bank account, with the same owners, can be a fraudulent transfer of funds.

{¶ 65} This assignment of error concerns money that Callista took belonging to her mother's estate and deposited in a Liberty Savings Bank certificate of deposit on May 3, 2007. The initial complaint in this case was filed May 3, 2012 and the four-year statute of

limitations for a fraudulent transfer claim means a transfer from Callista to Robert would have had to occur after May 3, 2008 to be within the statute of limitations. Central to the McHenry's argument is their conclusion that "Liberty CD 3705 was opened by Mrs. McHenry on May 4, 2007[5] as a joint certificate of deposit between Mrs. McHenry and Mr. McHenry. (Tr. P. 144, 197)." Appellant's Brief at 20. But the McHenry's are s incorrect. Our concerns about their representations regarding this account are twofold: first, the pages cited by the McHenrys do not support the argument that account 3705 was a joint account when first opened in May 2007, and second, the evidence reasonably supported a conclusion that account 3705 was opened solely in Callista's name and was "transferred" by being made into a joint account with Robert sometime after June 23, 2008. That timing of the transfer would place the transfer from Callista to a jointly-held account with Robert within the four-year statute of limitations.

**{¶ 66}** With respect to the McHenrys' citations to pages 144 and 197 of the transcript for the proposition that Callista opened the Liberty account 3705 in May 2007 as a joint account, neither cited page supports that conclusion. The evidence showed that when account 3705 matured in November 2008, the proceeds were used to open a jointly-held CD, first at National City Bank, account 4833, and when National City was acquired by PNC it apparently became PNC account 0500. On page 144, Mancz's attorney asked Callista, "we know 3705 is an account that *became* a joint account with your husband - at least a joint account with your husband - as 4833 with PNC, correct?" (Emphasis added.)

---

[5] The probate court judgment refers to Callista's opening a Liberty Bank CD with $54,188.96 on May 3, 2007. We are unable to reconcile the one-day date difference between the probate court's judgemnt and the McHenrys' reference to May 4, 2007. However, after reviewing all the testimony and exhibits, we are convinced they are referring to the same account, Liberty Account 3705.

Her response was affirmative. But nothing in that exchange or on that page reveals that Liberty account 3705 was joint when it was opened at Liberty Bank. On page 197, during the questioning of Robert, one can only discern that the available electronically-archived records from PNC account 0500 are "confusing," and that the money for that PNC account came from Robert's wife and from Liberty account 3705. Whether 3705 was initiated as a joint account is not addressed on page 197.

{¶ 67} At trial, Mancz argued that PNC CD account 0500 was an account solely in Robert's name. (*Id*. at 92-94.) Therefore, Mancz asserted the existence of a subsequent fraudulent transfer by Callista and Robert jointly from account number 4833 to Robert alone in PNC CD account number 0500.   In support of his claim that the PNC Bank CD was only in Robert's name, Mancz cited a letter he obtained from opposing counsel in discovery. (*Id*. at 89-90.) Mancz claimed the letter identified the account as being Robert's alone. Mancz also cited bank records he had obtained pertaining to the account. (*Id*. at 90-95.) At the top of one of the pages was the PNC CD account number and the name "Robert L. McHenry." (Plaintiff's Exhibit 15.)

{¶ 68}   In opposition to Mancz's argument, Callista denied that the PNC Bank CD was Robert's alone. (*Id*. at 91-96.) She maintained that it was a joint account. (*Id*.) Robert also testified that the PNC Bank CD remained a joint account that came into being as a result of National City Bank being acquired by PNC Bank. (*Id*. at 196-197.)

{¶ 69} For purposes of the fraudulent-transfer statute, a "transfer" includes "every direct or indirect, absolute or conditional, and voluntary or involuntary method of *disposing of or parting with an asset or an interest in an asset*[.]" (Emphasis added.) R.C. 1336.01(L). In light of this definition, we agree with the McHenrys that a transfer of money

from a National City joint account between Callista and Robert into a PNC joint account between Callista and Robert would not qualify as a potentially fraudulent transfer under the statute. Based on the evidence before us, we believe the weight of the evidence did not prove that PNC CD account number 0500 was in Robert's name alone. Nevertheless, the evidence was that Callista closed Liberty account 3705 on November 4, 2008 and deposited the proceeds of $56,465.68 in a National City Bank or PNC Bank joint certificate of deposit with Robert, originally bearing account number 4833. At some point, that account became PNC Bank CD account number 0500, which grew to have a balance of $59,025.

{¶ 70} The foregoing analysis does not end the inquiry about Liberty account 3705 because the evidence reveals that account 3705 was not a joint account with Robert when it was opened. It was in Callista's name alone. The jury reasonably could have concluded the evidence established a fraudulent transaction with regard to Liberty account 3705 sometime after June 23, 2008. The genesis of the Liberty 3705 account was a Bank One CD purchased with Audrey Kirby's funds. How the account was held at that time is undetermined but that Bank One CD matured January 9, 2007. The probate court determined:

> When the CD matured, its value was $78,411.57. Callista withdrew $16,000 on January 10, 2007, and she deposited $8,000 in Mrs. Kirby's Charter account and $8,000 in Callista's Liberty account #6925. On April 11, 2007, the day after her mother's death, Callista withdrew $8,500. Callista used the balance, $54,188.96 to purchase a 9 month CD *in her sole name* at Liberty Savings Bank on May 3, 2007.

(Emphasis added.) Probate Court Judgment, Exhibit 10 at 16. From this evidence, the jury could have found the Liberty 3705 account was in Callista's name only when it was opened.

{¶ 71} The jury also had a copy of Callista McHenry's sworn affidavit signed January 9, 2017 and submitted by her in this litigation. In an attempt to demonstrate that she was not insolvent when she made the June 2, 2008 real estate transfer, she said:

13. "At the time of the transfer of the Real Estate I held the following assets

*in my name*:

* * *

b. Liberty Savings CD [XX-XXXX]3705 had a June 23, 2008 balance of approximately $56,891.94."

(Emphasis added.) (Probate Court Judgment Exhibit 12.) Callista was careful in describing eight other assets in the affidavit to include only a "one-half interest" when she held something jointly with her husband. She did not do that for the Liberty account, reflecting that the 3705 account was hers alone as of June 23, 2008. Furthermore, in the probate litigation, Mancz had taken Callista's deposition in October 2010, and Callista then denied that Robert had received any of the money from her mother's estate, claiming that "it was my money." (Trial Tr. 76, 78.)

{¶ 72} To be complete, there was a page at the end of numerous attachments to Exhibit 38, the letter from the McHenry's counsel to Mancz revealing previously undisclosed accounts, which was a printout of an electronically-archived summary of 2008 activity for Liberty Account 3705. The heading of that summary listed both Callista and Robert, but that record did not say the account was jointly-held or, if so, when it

became jointly-held. No one was asked about, and no one referred to this attachment during the trial. And, when questioned about the Liberty to National City to PNC series of accounts, Robert was asked when it became a joint account; he replied "I don't recall the date." (Trial Tr. 196.)

{¶ 73} Given the evidence of the transfer of real estate on June 2, 2008, the transfer of $35,000 from one of Callista's Chase Bank accounts to a Huntington Bank account in Robert's name on July 9, 2008, and the deposit of $11,000 from Callista into a joint Chase account with Robert on November 20, 2008, the jury could have reasonably concluded that Callista's plan of transferring assets began with the real estate transfer of June 2, 2008. These transfers continued by her transferring financial accounts to Robert, including the Liberty account 3705, sometime after June 23, 2008, when she said the account was in her name, either before the account was closed at Liberty or when the proceeds were placed into a joint account in National City Bank, which later became a joint PNC account.

{¶ 74} Because the evidence supported the jurys conclusion that Callista opened Liberty account 3705 in her sole name and it was in her sole name until at least June 23, 2008, the transfer by making the account, or its proceeds, a joint account with Robert was a transfer within the four-year statute of limitations.[6] The seventh assignment of error is overruled.

---

[6] Given our conclusion that the jury could reasonably have found that there was a fraudulent transfer related to Liberty account 3705, or its proceeds, within the four-year statute of limitations, we need not address whether any earlier transfer could also have been within the statute of limitations based on justifiable late discovery of the transfer. There was evidence of failure to timely disclose transfers of funds and of late discovery of transfers. The jury was also instructed about these circumstances as a potential extension of the statute of limitations. Resolution of those issues is unnecessary.

{¶ 75} In their eighth assignment of error, the McHenrys contend the trial court erred in finding that Callista transferred any asset with actual intent to hinder, delay, or defraud any creditor of the debtor.

{¶ 76} In support of their argument, the McHenrys correctly note that intent to hinder, delay, or defraud can be established circumstantially by considering the 11 "badges of fraud" found in R.C. 1336.04(B). Under this assignment of error, the McHenrys do not address the evidence as it relates to each badge of fraud. Instead, they simply assert that Mancz failed to examine or inquire about any of the badges at trial. They argue that transferring assets was not enough to establish fraud and that Mancz "completely neglected" to address the badges of fraud that can establish fraud. With regard to Callista's conveyance of her interest in real estate to Robert, they also cite Robert's testimony that the conveyance was done on the advice of a lawyer. The McHenrys suggest that acting on the advice of counsel necessarily negates any inference of fraud that otherwise might exist.

{¶ 77} Upon review, we find the eighth assignment of error to be without merit. Although the badges of fraud were not identified as such and specifically discussed with witnesses at trial, a large part of Mancz's case involved attempting to establish their existence through the testimony and other evidence presented. We note too that jury interrogatories specifically addressed each of the badges of fraud. The jury responded to the interrogatories by making a finding that each badge had or had not been established. Whether Mancz's evidence supported a finding of fraudulent intent was an issue that was raised under the McHenrys' fifth and sixth assignments of error. For purposes of the eighth assignment of error, we reject the McHenrys' suggestion that Mancz attempted to

establish fraudulent intent by proving nothing more than a mere transfer of assets.

{¶ 78} We also find no merit in the McHenrys' claim that acting on the advice of counsel necessarily negated any inference of fraud with respect to Callista's transfer of her interest in real estate to Robert. Without more, the mere assertion that the McHenrys acted on the advice of counsel did nothing to dispel an inference of fraud. If counsel's "advice" was in response to a question from Callista or Robert about how to shield the McHenrys' home from potential creditors, then such advice would do nothing defeat an inference of fraudulent intent. The eighth assignment of error is overruled.

{¶ 79} In their ninth assignment of error, the McHenrys claim the trial court erred in finding that funds returned by Robert to Callista should be counted as a fraudulent transfer.

{¶ 80} In particular, the McHenrys contend the record contains "uncontroverted" evidence that Robert returned to Callista $22,085 that she had transferred into a Huntington Bank account in his name alone. Based on testimony that he had "returned" this money to Callista, the McHenrys assert that it was error for the jury to include those funds as part of its fraudulent-transfer verdict.

{¶ 81} We find the McHenrys' argument to be unpersuasive for at least two reasons. First, the testimony about Robert "returning" money to Callista involved $22,000 that she had placed in Chase bank accounts in his name. (Trial Tr. at 174-183.) It does not appear to have involved a separate $22,085.15 that Callista had placed in a Huntington bank account in his name. (*Id.* at 200-201.) Second, the jury was not obligated to believe Robert's self-serving testimony that he returned money to Callista. When Robert professed to have returned $22,000 from the Chase accounts to Callista, Mancz

asked what evidence Robert had to support his claim. Robert responded that "it" was in Mancz's discovery "some place." (*Id.* at 177.) When Mancz later accused Robert of having no documentary evidence to support his claim about returning $22,000 to Callista, Robert responded that Mancz "should have the evidence." (*Id.* at 183.) But Mancz apparently did not have any such evidence, the McHenrys have not cited any such evidence, and we have not seen any such documentary evidence.

{¶ 82} On appeal, the McHenrys correctly observe that Robert had no legal burden to produce evidence to support his testimony about returning money to Callista. It is equally true, however, that the jury was free to disbelieve Robert's testimony. Indeed, it is well settled that a jury, as the trier of fact, is responsible for assessing witness credibility and may believe some, all, or none of what a witness says. *Bailey v. Wilson*, 2d Dist. Champaign No. 2015-CA-19, 2016-Ohio-3352, ¶ 15. Accordingly, the ninth assignment of error is overruled.

{¶ 83} In their tenth assignment of error, the McHenrys assert that the trial court erred in finding that Kirby's estate suffered any damage by virtue of a single transfer of assets.

{¶ 84} The McHenrys' entire substantive argument is as follows:

> The evidence in this case never established that Appellee [Mancz] could not collect on its judgment [in the underlying probate-court case]. Appellee failed to prove any harm flowing from the alleged fraudulent transfers. Appellee never established that the accounts made joint somehow became out of his reach for collection. Shockingly, since 2011, Appellee has never even attempted to collect on the judgment from the

[probate court], which he certainly would have been successful in doing if he had filed a bank account attachment.

How can one be awarded damages for their own lack of due diligence? There was no harm to Appellee because there was no attempt to recover and the accounts were not placed out of his reach for collection. Appellee again bore the burden of proof to establish his harm and failed to do so.

(Appellants' Brief at 26.)

**{¶ 85}** Upon review, we find the foregoing argument to be unpersuasive. As an initial matter, not all of the bank accounts involved in allegedly fraudulent transfers were joint accounts. Nor were they all in existence at the time of the probate court judgment. In any event, the McHenrys have not cited any requirement for Mancz to pursue a collection action in probate court before seeking to establish the existence of fraudulent transfers involving Callista and Robert. We note too that Mancz testified below and addressed the issue of collecting on the judgment in the probate-court case. He recalled deposing Callista and testified that "in the execution deposition of Callista McHenry, she claimed as she has claimed that she has nothing." (Trial Tr. at 328.) Mancz further testified that he contacted the McHenrys' counsel and the response he received about the funds at issue "was that they were all gone somewhere." (*Id.* at 330.) Mancz also testified that he had contacted the McHenrys about returning the funds at issue, but they did not offer him any money. (*Id.* at 333.) We note too that Mancz could not have attempted to satisfy the probate-court judgment against Callista by executing against the McHenrys' residence, as it had been transferred to Robert. For these reasons, we see nothing

inappropriate about Mancz initiating the present lawsuit. The tenth assignment of error is overruled.

{¶ 86} In their eleventh assignment of error, the McHenrys challenge the trial court's overruling of their motion for summary judgment. In particular, they note that they moved for summary judgment on the following eight grounds: "(1) There was not a fraudulent transfer of real property or personal property by Mrs. McHenry; (2) Appellants' interest in the Real Estate is exempt from collection by Appellee under ORC 2329.66, and, therefore, Appellee's claim is moot; (3) The remainder of Appellants' assets are exempt from collection by law and, therefore, Appellee's claim is moot; (4) Because there are no collectable assets belonging to Appellants, Appellee's suit for alleged fraudulent transfers serves merely to harass; (5) Appellee's second claim for relief against Mrs. McHenry is barred by the doctrine of res judicata; (6) Appellee's second claim for relief against Mr. McHenry is barred by the doctrine of res judicata; (7) Appellee's second clam for relief against Mr. McHenry is barred by the applicable statute of limitations; (8) Appellee is not entitled to punitive damages." (Appellants' Brief at 28.)

{¶ 87} Rather than arguing any of the foregoing issues in their appellate brief, the McHenrys merely refer us to the record below. They purport to "incorporate herein all arguments in their entirety contained in *Defendants' Amended and Supplemental Motion for Summary Judgment* filed on January 8, 2018, *Defendants' Reply to Plaintiffs' Response to Defendants' Amended and Supplemental Motion for Summary Judgment* filed on February 9, 2018, *Defendants' Supplemental Objections to Magistrate's Decision* filed August 21, 2018 and *Defendants' Reply to Plaintiff's Response to Defendants' Supplemental Objections to Magistrate's Decision* filed on September 18, 2018." (*Id.*) The

McHenrys then conclude their assignment of error with the following broad argument: "The trial court's decision was in error because Appellee did not provide the requisite evidence on any issue for which he bore the burden of production at trial. Appellee rested on allegations and suspicions, but not evidence. Summary Judgment should have been granted in Appellant's favor." (*Id.*)

{¶ 88} Upon review, we note that the first document the McHenrys incorporate by reference into their appellate brief is a 26-page "amended and supplemental" summary-judgment motion, which includes approximately 180 pages of supporting exhibits. The second document is another seven pages. The third document is 11 pages. And the final document they incorporate into their appellate brief by reference is six pages. Thus, not counting the 180 pages of summary-judgment exhibits, the four documents the McHenrys incorporate by reference into their 35-page appellate brief total 50 pages, effectively making their appellate brief 85 pages long. The practice of wholesale "incorporation by reference" cannot be used to circumvent page limits for briefs established by the appellate rules. Moreover, the practice of an appellant incorporating issues and arguments by reference to other documents is not authorized by the appellate rules. The Twelfth District Court of Appeals examined this issue in *Ebbing v. Lawhorn*, 12th Dist. Butler No. CA2011-07-125, 2012-Ohio-3200, reasoning:

> The appellate rules expressly provide what an appellant must include in an appellate brief and the resulting consequences if an appellant chooses to ignore the rules. App.R. 16(A)(7) states that an appellant shall include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support

of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary." Thus, pursuant to App.R. 16, arguments are to be presented within the body of the merit brief.

If an appellant fails to comply with App.R. 16(A), an appellate court may overrule the assignment of error as stated in App.R. 12(A)(2): "The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."

It is well-established that "the Rules of Appellate Procedure do not permit parties to 'incorporate by reference' arguments from other sources." *Kulikowski v. State Farm Mut. Ins. Co.*, 8th Dist. Nos. 80102 and 80103, 2002-Ohio-5460, ¶ 56; *Tripodi Family Trust v. Muskingum Watershed Conservancy Dist.,* 5th Dist. No. 2007AP 09 0056, 2008-Ohio-6902; *McNeilan v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 10AP-472, 2011-Ohio-678. It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to an alleged error. *Cireddu v. Cireddu*, 8th Dist. No. 76784, 2000 WL 1281253, *9 (Sept. 7, 2000). An appellate court is not a "performing bear," required to dance to each and every tune played on appeal. *Id.*

Consequently, and pursuant to App.R. 12 and 16, we decline to consider appellant's second and third assignments of error.

*Id.* at ¶ 29-32.

{¶ 89} In *Ebbing*, the Twelfth District declined to consider assignments of error related to the trial court's ruling on a motion to strike and a motion for default judgment where the appellant simply incorporated those motions into his appellate brief "by reference." Admittedly, this court at times has overlooked *limited* incorporation by reference in the interest of justice. Here, however, the McHenrys' eleventh assignment of error abuses that process, adding 50 pages and eight issues that are not properly argued to their already-lengthy appellate brief.

{¶ 90} In any event, we find the McHenrys' summary-judgment arguments to be unpersuasive on the merits. Two of the eight issues the McHenrys incorporate by reference require no discussion. The first summary-judgment argument incorporated by the McHenrys is that "[t]here was not a fraudulent transfer of real property or personal property by Mrs. McHenry." This issue involves questions of fact that were resolved in Mancz's favor by the jury. "Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Cont'l Ins. Co. v. Whittington*, 71 Ohio St. 3d 150, 642 N.E.2d 615 (1994), syllabus. The eighth summary-judgment argument incorporated into the McHenrys' appellate brief is even more patently meritless. The eighth argument asks us to find that Mancz was not entitled to punitive damages. But neither the magistrate nor the trial court awarded Mancz any punitive damages. His motion for punitive damages was denied. We note too that the fifth and sixth summary-judgment arguments address the applicability of res judicata, an issue we

resolved above in our analysis of the second assignment of error.

{¶ 91} As for the McHenrys' remaining four summary-judgment arguments, we find them to be unpersuasive. In their second argument, the McHenrys contend their interest in the real estate is exempt from collection under R.C. 2329.66. In their third argument, they assert that the other assets at issue are exempt from collection "by law." In their fourth argument, they reason that in the absence of any non-exempt assets demonstrates that Mancz's fraudulent-transfer lawsuit was intended merely to harass.

{¶ 92} Upon review, we find the McHenry's three exemption-related arguments unpersuasive. In their summary-judgment motion, they argued that their real estate and other assets were exempt from "collection" by Mancz, making the entire fraudulent-transfer action moot. The trial court rejected this argument, reasoning:

> The McHenrys next claim the magistrate erred in her decision wherein she determined this matter is not moot as a result of asset exemption.
>
> As the McHenrys point out, certain assets held by individuals domiciled in the State of Ohio are exempt from execution. *See* R.C. 2329.66. When interpreting the right to an exemption as provided by this statute, Ohio courts have ruled that exemption may be claimed in an answer or even claimed after a judgment has of been issued, but in the case of the homestead exemption, have conclusively stated that the time for asserting the right is prior to the foreclosure sale. *Gledhill v. Walker* (1944), 143 Ohio St. 381; *Adkins v. Massie*, 4th Dist. App. No. 99CA18, 2001 Ohio 2448; *Gale v. Ficke*, 148 Ohio App.3d 657, 2002 Ohio 4030. "In other words, the

debtor's right to exercise the homestead exemption is determined as of the date of execution, garnishment, attachment, or sale of the property." *Adkins, supra.* The logic of the timing of the assertion of an exemption is equally applicable to the other asset exemptions contained in the statute. Indeed, this is consistent with case law relating to the time for the assertion of the debtor's exemption claim, which is after judgment has been rendered. *Gale, supra.* Simply put, the McHenrys' claim of asset exemption is premature.

Moreover, as the Magistrate pointed out, R.C. 1336.07 gives the trial court broad discretion in fashioning an appropriate remedy, depending upon the facts and circumstances proven at trial. Based upon the foregoing, the Court overrules the McHenrys' third objection to the Magistrate's decision.

(September 28, 2018 Decision and Judgment Entry on Defendants' Objections to Magistrate's Decision at 5.)

{¶ 93} In essence, the trial court found that the focus of Mancz's fraudulent-transfer action was on whether the conveyances and transfers at issue were fraudulent and should be set aside. Indeed, under R.C. 1336.07(A)(1), one of the available remedies when a fraudulent transfer is established is "avoidance of the transfer or obligation." The trial court reasoned that whether execution on a judgment or attachment of assets was proper was a separate question to be determined later. Notably, the asset-exemption statute cited by the McHenrys, R.C. 2329.66, identifies property that is "exempt from execution, garnishment, attachment, or sale to satisfy a judgment or order[.]" *See also UBS Fin. Servs., Inc. v. Lacava*, 8th Dist. Cuyahoga No. 106461, 2018-Ohio-3055, ¶ 46 (finding argument regarding asset exemption under R.C. 2329.66(A) premature in a

fraudulent-transfer action where execution upon a judgment "has not yet occurred").

{¶ 94} In the present case, the trial court's final judgment entry did not order execution, garnishment, attachment, or sale of any assets. The trial court simply ordered the deed conveying Callista's interest in the real estate to Robert declared void and, with respect to the other fraudulently conveyed assets, entered judgment in favor of Mancz. (November 13, 2019 Decision and Judgment Entry at 5.)

{¶ 95} The summary-judgment motion that the McHenrys incorporate by reference on appeal asserts only that their assets are exempt from collection. The motion fails to address the trial court's finding that the present action is not a collection action and, therefore, that their exemption argument is premature. Because the McHenrys' appellate brief fails to recognize or address the basis for the trial court's ruling against them, it follows that they have failed to demonstrate error in that ruling.

{¶ 96} In their final argument, the McHenrys contend Mancz's second claim for relief against Robert was barred by the applicable statute of limitation. The McHenrys' entire summary-judgment argument, as incorporated into their appellate brief by reference, was as follows:

To the extent that this case is an attempt by Plaintiff [Mancz] to remedy his failure to name Robert McHenry in the [probate court] case, that attempt must fail due to the statute of limitations. The applicable statute of limitations on an ORC 2109.50 claim is four years. RC 2305.09. *See, also*, *Gustafson v. Miller*, 5th Dist. Perry No. 15-CA-0008, 2015-Ohio-5515. Audrey Kirby died on April 10, 2007. Any claims Plaintiff had against Robert McHenry with regard to the assets of Audrey Kirby should have been

brought within four years of her death or by April 10, 2011, and, as such, they are forever barred. Summary judgment in favor of Robert McHenry is an appropriate remedy for a violation of the statute of limitations as there is no genuine issue of material fact to be litigated.

(Defendants' January 8, 2018 Amended and Supplemental Motion for Summary Judgment at 24.)

{¶ 97} In rejecting the McHenrys' argument, the magistrate noted that Mancz's claims were fraudulent-transfer claims brought under R.C. 1336. They were not claims brought under R.C. 2109.50, which addresses discovery proceedings brought in probate court to examine individuals suspected of concealing or embezzling assets of an estate. Here, the probate court already had determined that Callista had concealed and embezzled assets from her mother's estate. The fraudulent-transfer action addressed her conveyance of those assets to Robert. The magistrate noted that the applicable statute of limitation for a fraudulent transfer begins to run when the transfer is made or, possibly later, when the transfer is discovered. Here at least some of the transfers at issue occurred well after the death Audrey Kirby. That being so, the magistrate correctly rejected the McHenrys' summary-judgment argument that the statute of limitation began to run when Callista's mother passed away. (July 10, 2018 Magistrate's Decision on Motion for Summary Judgment at 5.) We note too that the McHenrys' summary-judgment motion did not even address discovery of the transfers.

{¶ 98} In objections to the magistrate's decision, the McHenrys broadened their argument, asserting that Callista had spent money or written checks from various estate accounts prior to her mother's death. The McHenrys also argued that various accounts

had been opened by Callista prior to her mother's death. (August 21, 2018 Supplemental Objections at 8.) In response, Mancz asserted that Callista depositing and spending her mother's money was not shown to be improper until the probate court filed its decision in June 2011. Mancz also presented evidence that transfers from Callista to Robert from the accounts she had opened with her mother's money were unknown to him until March 2016 during discovery in this case and that some of the transfers occurred long after Audrey Kirby's death. (August 30, 2018 Plaintiff's Response in Opposition to Objections.)

{¶ 99} Ultimately, the trial court overruled the McHenrys' objections. With regard to the real-estate transfer, the trial court found that the conveyance had occurred on June 2, 2008 and that Mancz had filed his initial complaint in May 2012, within the applicable four-year statute of limitation. Mancz subsequently dismissed the complaint on March 25, 2014 and refiled it on March 11, 2015, within the time allowed by the one-year saving statute. As for the financial assets, the trial court concluded, based on the parties' filings and the evidence before it, that "whether Mancz discovered the transfers of proceeds * * * within either the four-year limitation period or, if later, within one year after the transfers reasonably could have been discovered by him or not is a question of fact for the jury to determine." (September 28, 2018 Decision and Judgment Entry at 4.) As a result, the trial court found no error in the magistrate's denial of summary judgment regarding the statute of limitation. (*Id.*)

{¶ 100} Upon review, we agree with the trial court's determination. The McHenrys' actual summary-judgment argument predicated on R.C. 2305.09 and the statute of limitation beginning to run on the death of Audrey Kirby lacks merit. Based on the record before us, we also see no error in the trial court's finding a genuine issue of material fact

as to whether Mancz timely filed suit after the fraudulent transfers at issue or after reasonably discovering them. The McHenrys failed to establish their entitlement to judgment as a matter of law on that issue. For all of the foregoing reasons, we overrule their eleventh assignment of error.

{¶ 101} In their twelfth assignment of error, the McHenrys contend the trial court erred in overruling a motion in limine and subsequent objections to the same evidence at trial. This assignment of error concerns a five-part October 19, 2018 motion in limine the McHenrys filed. Therein, they sought to exclude from trial: (1) the trial court's judgment in the probate-court case to the extent it contained inflammatory and prejudicial language; (2) any itemization of the plaintiff's damages, whether through testimony or an exhibit; (3) any testimony from Mancz on the basis that he could not act as both an advocate and a witness; (4) any records from financial institutions or related testimony on the basis of hearsay; and (5) any reference to a disciplinary complaint.

{¶ 102} In an October 26, 2018 decision, the magistrate overruled the first branch of the motion, finding that the probate-court judgment established Mancz as a "creditor," which was an issue in the present case. The magistrate also found that the question in the probate-court case was whether Callista was guilty of having concealed, embezzled, or conveyed away assets belonging to her mother. The probate judgment made this finding, and the magistrate saw no basis for excluding it.

{¶ 103} The magistrate deferred ruling on the second branch of the motion, finding no evidence that Mancz had failed to turn over an itemized list of damages or that such a list even existed. With regard to the third branch, the magistrate declined to preclude Mancz from testifying on the basis of Ohio Professional Conduct Rule 3.7, which limits

the ability of an attorney to act as both an advocate and a witness. The magistrate found that the rule did not apply when an attorney is a party to the case. With regard to the fourth branch, the magistrate noted that the financial records could be authenticated as business records, thereby overcoming a hearsay objection. As a result, the magistrate declined to exclude the records "at this time." Finally, the magistrate declined to rule on the request to exclude a disciplinary complaint without knowing the substance of the complaint or the context in which it might be used.

{¶ 104} The McHenrys objected to the magistrate's liminal ruling by filing a November 5, 2018 motion asking the trial court to set it aside. Notably, however, the McHenrys did not challenge or object to the magistrate's finding that Mancz could act as counsel and testify at trial because he was a party. On January 4, 2019, the trial court overruled the McHenrys' motion to vacate the magistrate's decision. The trial court noted that the probate proceeding was quasi-criminal and that the probate judge was required to determine whether Callista was guilty of concealing, embezzling, or conveying away assets. The trial court saw no error in the magistrate's resolution of the issue but noted that it could be revisited at trial. The trial court also saw no error in the magistrate's resolution of the other issues, noting that they could be resolved in context if and when they arose at trial. With regard to the financial records, the trial court specifically noted that they might be authenticated in various ways and that it remained to be seen how the plaintiff approached them at trial.

{¶ 105} A motion in limine is a pretrial request for a precautionary, tentative, and presumptive ruling on an evidentiary issue to avoid error or prejudice at trial. If a trial court resolves a motion in limine before trial, its ruling is effective only until the admissibility of

the evidence is determined in context at the appropriate time during trial. *Cranford v. Buehrer*, 2d Dist. Montgomery No. 26266, 2015-Ohio-192, ¶ 13, quoting *State v. Leslie*, 14 Ohio App.3d 343, 344, 471 N.E.2d 503 (2d Dist.1984). "An appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." *Id.*

{¶ 106} On appeal, the McHenrys first challenge the admission of the language in the probate-court judgment stating that Callista had been found guilty of concealing, embezzling, or conveying away assets belonging to her mother. They have not identified anywhere in the 765-page trial transcript, however, where they objected when that issue arose at trial. Regardless, we see no abuse of discretion in allowing the jury to hear that information. The probate-court judgment was the predicate for the present lawsuit alleging the existence of fraudulent conveyances. Moreover, the fact that Callista had been found to have concealed, embezzled, or conveyed away her mother's assets provided necessary and relevant context for the present lawsuit. We note too that the challenged language from the probate-court judgment was referenced at times to refute the McHenrys' repeated suggestions that Callista had done nothing wrong and that the money at issue belonged to her. (*See, e.g.*, Trial Tr. at 173.) The McHenrys also argue that no one authenticated Exhibit 10, which is a copy of the probate-court judgment, or identified Exhibit 10 as an accurate representation of that judgment. The McHenrys fail to mention the parties' *stipulation* at trial that Exhibit 10 was a copy of the probate-court decision and judgment. (*Id.* at 170-172.)

{¶ 107} The McHenrys next allege error with regard to their motion in limine insofar as it sought to preclude Mancz from presenting an itemization of damages. We note that

the McHenrys did renew this objection at trial when Mancz sought to use demonstrative exhibits for that purpose in his closing argument. (Trial Tr. at 562-565.) We addressed Mancz's use of the demonstrative exhibits to itemize damages and found no error in our resolution of the sixth assignment of error. We likewise see no error in overruling the motion in limine on that issue.

{¶ 108} The McHenrys also challenge the motion in limine insofar as it sought to preclude Mancz from acting as an advocate and testifying at trial. In support, they cite Ohio Prof.Cond.R. 3.7, which limits the circumstances under which an attorney may act as both an advocate and a witness at trial. They also assert in conclusory fashion that Mancz "had no personal knowledge of any transaction at issue in this case."

{¶ 109} With regard to the professional-conduct rule, the McHenrys have not even responded to the magistrate's finding that the rule did not apply because Mancz was a party to the case. Absent any argument from the McHenrys on this point, we have nothing to review. We note too that the McHenrys' objections to the magistrate's ruling on the motion in limine did not address this issue. Nor did they raise the issue in their post-trial objections to the magistrate's decision. Therefore, they failed to preserve the issue for appeal. As for Mancz's purportedly lacking "personal knowledge" of the transactions at issue, a cursory review of his trial testimony reveals that he provided relevant testimony despite the fact that he was not a party to the transactions. The McHenrys' one-sentence argument to the contrary is unpersuasive.

{¶ 110} Finally, the McHenrys contend their motion in limine should have been sustained insofar as they challenged the admissibility of bank records and related testimony. They argue that the records and any testimony about them constituted hearsay

and that Mancz failed to demonstrate applicability of the business-records exception under Evid.R. 803(6). The McHenrys argue that the records should have been authenticated through testimony of the custodian of records or other qualified witness.

{¶ 111} We find the McHenry's authentication argument to be without merit. At trial, Mancz sought and obtained the admission of three exhibits containing financial records, namely Plaintiff's Exhibits 15, 17, and 25. When Mancz moved for admission of these exhibits at trial, the McHenrys did not raise a hearsay objection to *any* of them. Indeed, their counsel acknowledged that the McHenrys themselves had "authenticated" portions of Exhibit 15, and the trial court admitted only those portions. (Trial Tr. at 439, 491.) Defense counsel also agreed that the McHenrys had been questioned about the portions of Exhibit 17 that were admitted into evidence and raised "no objection" as to those records. (*Id.* 480-481.) Defense counsel further affirmatively agreed to the admission of portions of Exhibit 25 concerning a signature card and "account activity," and these were the only portions of that exhibit admitted into evidence. (*Id.* at 457, 490.) We note too that the McHenrys lodged no hearsay objection when the foregoing exhibits were introduced and discussed at trial. (*Id.* at 91, 99-100, 200.) In light of the McHenrys' failure to preserve the hearsay issue raised in their motion in limine by renewing their challenge at trial (rather than agreeing to the admissibility of the exhibits), we find their argument unpersuasive. The twelfth assignment of error is overruled.

{¶ 112} In their thirteenth assignment of error, the McHenrys claim the trial court erred in overruling their motion for sanctions and motion to dismiss Mancz's complaint. This assignment of error concerns a motion the McHenrys filed alleging that Mancz had violated a local rule requiring him to prepare and submit a complete set of jury instructions

and interrogatories approved by opposing counsel. The McHenrys argued that Mancz filed proposed jury instructions and interrogatories by the required October 16, 2018 date *without* them having been seen or approved by opposing counsel. The McHenrys further asserted that Mancz did not serve their counsel with his filing until three days later. They also asserted that Mancz had done the same thing when the case previously had been set for trial. As a result, they sought sanctions and dismissal of the case with prejudice. Mancz responded to the motion, arguing that both parties previously had submitted proposed instructions and interrogatories before an earlier trial date had been vacated. Mancz suggested that his subsequent filing on October 16, 2018 was simply a "reformalization" of what previously had been filed.

{¶ 113} In a November 20, 2018 decision, the magistrate overruled the sanctions motion. The magistrate noted, among other things, that trial had been postponed yet again until January 7, 2019. The magistrate further noted that the parties would be required to submit jointly-proposed jury instructions by December 26, 2018. In light of that determination, the trial court found no prejudice to the McHenrys as a result of Mancz's filing on October 16, 2018. In the exercise of discretion, the magistrate declined to impose sanctions on Mancz or to dismiss his lawsuit. (November 20, 2018 Decision.) The McHenrys objected to the magistrate's decision. The trial court overruled the objection on December 5, 2018, and the parties subsequently filed joint proposed jury instructions, jury interrogatories, and verdict forms on December 26, 2018.

{¶ 114} It is axiomatic that whether to impose sanctions or to dismiss the complaint was a matter within the discretion of the trial court. Having reviewed the parties' arguments and the rulings by the magistrate and the trial court, we see no abuse of

discretion. The thirteenth assignment of error is overruled.

## Conclusion

{¶ 115} The judgment of the trial court is hereby affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Harry G. Beyoglides, Jr.
Richard A. Boucher
Julia C. Kolber
Hon. Michael A. Buckwalter