[Cite as *Alegre, Inc. v. Hyde Component Sales, Inc.*, 2022-Ohio-542.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| ALEGRE, INC., et al. | : | |
| | : | |
| Plaintiffs-Appellees | : | Appellate Case No. 29093 |
| | : | |
| v. | : | Trial Court Case No. 2017-CV-1321 |
| | : | |
| HYDE COMPONENT SALES, INC., et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Defendants-Appellants | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of February, 2022.

. . . . . . . . . .

SCOTT K. JONES, Atty. Reg. No. 0069859 & DANIEL J. KNECHT, Atty. Reg. No. 0086463, 7570 Bales Street, Suite 200, Liberty Township, Ohio 45069
 Attorneys for Plaintiffs-Appellees

CRAIG T. MATTHEWS, Atty. Reg. No. 0029215 & BROOK F. POLING, Atty. Reg. No. 99065, 320 Regency Ridge Drive, Centerville, Ohio 45459
 Attorneys for Defendants-Appellees

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendants-Appellants, Hyde Component Sales, Inc. ("HCS") and Kevin Hyde ("Hyde"), appeal from a judgment of the Montgomery County Court of Common Pleas, which denied the company's motion for a directed verdict at the close of trial. HCS also appeals the trial court's award of attorney fees to Plaintiffs-Appellees, Alegre Inc. ("Alegre") and Don Phillips & Associates, Inc. ("DPA"). For the reasons that follow, the judgment of the trial court will be affirmed.

## I.     Facts and Procedural History

{¶ 2} The story of the litigants in this case began in the mid-1980s when Kevin Hyde, the president of HCS, and Don Phillips, president of DPA, met at a conference when they were both working for DELCO. By the early 1990s, Hyde and his wife, Sandy, began socializing with Don and his wife, Lilly, and before too long, the couples became good friends, spending vacations and holidays together.

{¶ 3} In 1992, the Phillipses, who had both previously worked in the automotive industry in various capacities, started their own companies; Lilly Phillips owns Alegre and Don Phillips owns DPA. Alegre purchases component parts for various types of products and industries (including the automotive industry) and then supplies them to manufacturers. For instance, Alegre sources a part manufactured in South Korea and sells it to GM for use in trucks. DPA, on the other hand, is the sales arm of Alegre. Its purpose is to find customers that are interested in buying products from Alegre and its other clients.

{¶ 4} Both Alegre and DPA had been successful ventures for the Phillipses, but like most involved in the auto industry, they were hit hard by the "Great Recession" in

2008. Hyde also was negatively affected by the auto industry collapse and, after being terminated from his job at Engineered Component Sales, he started a company of his own, HCS, which represents small parts manufacturing companies and attempts to get their products in the hands of larger companies in the automotive supply chain. In October 2008, Hyde approached the Phillipses about doing business together. Even though Alegre and DPA had recently been forced to lay off employees and take pay cuts, the Phillipses, based on their relationship with Hyde, agreed to hire him.

{¶ 5} The 2008 contract signed by the parties allowed Hyde to work on growing his own business, HCS, while selling parts and attempting to gain additional clients for Alegre and DPA. He was paid a base salary, plus a commission, and was reimbursed for work done representing Alegre/DPA clients. The contract also included a non-disclosure agreement in which Hyde consented to keep proprietary business information (client and vendor information, contracts, pricing information, etc.) confidential. Additional agreements which altered rates of commission and Hyde's title were implemented in 2010 and 2011, and arguably in 2012, but the non-disclosure agreement remained operational.

{¶ 6} In early January 2017, Hyde delivered a letter to the Phillipses purporting to terminate their business relationship. In it, Hyde explained that he believed that DPA had failed to make any sales on behalf of his company, HCS. He also alleged that Don Phillips was secretly attempting to engage in business with a direct competitor of HCS's most important client.

{¶ 7} After a meeting with the Phillipses a few days later, Hyde decided to put his resignation on hold and continue to work with the Phillipses and their companies. Shortly after calling off his resignation, Hyde met with Roger McNutt, the computer and IT

systems manager for Alegre and DPA, and asked him for help with transferring information and emails from Alegre's server to a separate one owned by Hyde. (At that time, Hyde had an HCS email and an Alegre email account, both of which were hosted on Alegre's server.) McNutt found the request suspicious, declined to help, and as a result, made a copy of Hyde's mailbox as it was on that day. McNutt made additional copies throughout the month.

{¶ 8} Hyde began coming into the office on the weekend to transfer files from Alegre's server onto the separate HCS server. According to trial testimony, those emails included trade secrets for some of Alegre's most important accounts. Trial evidence also indicated that Hyde tried to cover-up his actions by deleting gigabytes worth of files and emails from the Alegre servers after they were transferred to his private server.

{¶ 9} After the data was transferred off the Alegre server, Hyde ended his professional relationship with the Phillipses and their companies, and the lawsuit at the heart of this appeal was filed by Alegre and DPA on March 15, 2017. The suit included claims and counterclaims of breach of contract, spoliation of evidence, piercing the corporate veil, unjust enrichment, and central to this appeal, misappropriation of trade secrets. After years of motion practice and depositions, the case proceeded to trial in January 2020. The multi-day trial featured scores of exhibits and testimony from Don and Lilly Phillips, Hyde, McNutt, and others. At the end of the proceeding, Hyde and HCS moved for a motion for a directed verdict on all of Alegre's and DPA's claims, including misappropriation. The trial court denied the motion, and the case went to the jury.

{¶ 10} On January 24, 2020, the jury found in favor of Alegre and DPA on the breach of contract and misappropriation of trade secrets claims. It awarded $5,000

against Hyde and $5,000 against HCS for the misappropriation. The jury awarded Alegre and DPA $37,318 for breach of contract. It did not, however, award punitive damages.

{¶ 11} A separate hearing for attorney fees took place on February 1, 2020. At that hearing, counsel for Alegre and DPA presented invoices showing attorney fees of nearly $339,000 and presented testimony from an expert who attested to the reasonableness of the fees and billing rates charged by the firm in the matter. Alegre and DPA also introduced spreadsheets that Hyde had failed to turn over in discovery that purportedly showed his possession of extremely sensitive proprietary data belonging to the companies.

{¶ 12} Ultimately, the trial court declined to award the full amount of attorney fees requested by Alegre and DPA. It found instead that because, in its estimation, 30% of the trial and preparation time was spent on the issue of the misappropriation of trade secrets, and because Alegre and DPA prevailed on two of the five claims brought to trial, the proper attorney fee award was $110,000, for which Hyde and HCS were jointly and severally liable.

{¶ 13} Hyde and HCS now appeal, raising two assignments of error.

## II.    Directed Verdict

{¶ 14} In their first assignment of error, Hyde and HCS argue that the trial court erred by denying their motion for directed verdict as to Alegre's and DPA's misappropriation of trade secrets claim. To decide this assignment of error, we must examine the intersection of two areas of law: directed verdicts and misappropriation of trade secrets.

{¶ 15} Motions for directed verdicts test the legal sufficiency of the evidence, not

its weight or witness credibility, and as a result, our review of the trial court's judgment is de novo. *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 257, 741 N.E.2d 155 (2d Dist.2000). "A directed verdict is proper if, construing the evidence most strongly in favor of the non-moving party, the trial court 'finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' " *Mancz v. McHenry*, 2d Dist. Greene No. 2019-CA-74, 2021-Ohio-82, ¶ 44, quoting Civ.R. 50(A)(4). The test "requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire Co., v. Aetna Casualty & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3. Put a different way, we must affirm a trial court's denial of a motion for directed verdict if there is *any* evidence that supports the non-moving party's claim.

{¶ 16} As to misappropriation, R.C. 1333.61(B)(1) prohibits the misappropriation of trade secrets by acquiring them through improper means. To fully understand that, however, two definitions need to be explained. First, "misappropriation" means any of the following: (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was gained by improper means; (2) disclosure or use of a trade secret of another without the consent of the other person by a person. R.C. 1333.61(B). It is important to note that "misappropriation" is defined in the disjunctive. When R.C. 1333.61(B) states that "misappropriation" means *any of the following*, it means that a misappropriation could be acquisition of the trade secret *or* disclosure/use of it. *See Aday v. Westfield Ins. Co.*, 486 F.Supp.3d 1153, 1169 (S.D.Ohio 2020). It does not require evidence that the trade secret has actually been used.

{¶ 17} The statute then defines "improper means" through the examples of theft, bribery, misrepresentation, breach of a duty to maintain secrecy, or espionage through electronic or other means. R.C. 1333.61(A).

{¶ 18} In this case, the evidence demonstrates that after initially resigning, Hyde changed his mind and continued to work at the Alegre facility. He approached McNutt, who oversaw IT for the companies, and asked for help in retrieving HCS emails in bulk from the Alegre server so he could have them on another computer or server. McNutt found the request suspicious given its timing and copied Hyde's mailbox as it was on that day. Trial Tr. at 475. Hyde then began to come into the office during non-business hours, when no one was around, to transfer files and emails from Alegre's servers onto his own. Trial Tr. at 458-459.

{¶ 19} Trial testimony indicated that some of the files contained sensitive information, including customer and vendor pricing information for several of Alegre's most important clients. Trial Tr. at 232-242; 455-459.

{¶ 20} McNutt testified that Hyde's actions were more nefarious than just forwarding emails to himself; he was actively deleting files from Alegre's server after they were transferred. Hyde admits as much in his brief. Appellant's brief at 6-7. McNutt stated that if Hyde was just forwarding emails off one server to another, the amount of stored data would grow, but as it was, the file size of Hyde's mailbox went from 11.2 gigabytes to 8.81 gigabytes between January 9 and January 31. Trial Tr. at 476. The reduction of gigabytes was from Alegre's server.

{¶ 21} Based on all that evidence, we cannot say that the trial court erred by not granting the motion for directed verdict. While Hyde and HCS contend that there were

legitimate reasons he took the trade secrets, this alternate explanation did not mean they were entitled to a directed verdict. To the contrary, to obtain the directed verdict on the misappropriation of trade secrets claim, Hyde and HCS would have had to show a complete absence of evidence of the misappropriation, something they could not do. As Alegre and DPA argue, Hyde, without permission, acquired the trade secrets by clandestinely removing them from Alegre's sever when no one was around and then deleting the files to cover his tracks. Appellee's brief at 10. The evidence above, taken in the light most favorable to Alegre and DPA, demonstrates that there was at least *some* evidence in support of their claim. The first assignment of error is overruled.

### III.    **Attorney Fees**

{¶ 22} Hyde and HCS claim in their second assignment of error that the trial court erred by granting Alegre's and DPA's motion for attorney fees. Their main argument is that, because the jury did not find "actual malice" and award punitive damages, Alegre and DPA were ineligible for attorney fees. We disagree.

{¶ 23} Appellate courts review attorney fee awards for an abuse of discretion. *Miller v. Grimsley*, 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, ¶ 11 (10th Dist.). To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232, 466 N.E.2d 875 (1984).

{¶ 24} Ohio follows the "American Rule" for attorney fees which does not permit the prevailing party to recover attorney fees unless one of two exceptions applies: statutory authorization (*see Martcheva v. Dayton Bd. of Edn.*, 2d Dist. Montgomery No. 29144, 2021-Ohio-3524, ¶ 29), or pursuant to the common law when punitive damages

are awarded in tort cases involving fraud, insult, or malice.   *See Miller* at ¶ 12.

{¶ 25} While Hyde and HCS are correct that the jury did not award punitive damages or find actual malice, that fact is not the end of the road; there is still another avenue under which Alegre and DPA would be eligible for attorney fees: statutory authorization. The statutory predicate in this case is R.C. 1333.64 of Ohio's Uniform Trade Secrets Act. The statute provides that the court may award reasonable attorney fees to the prevailing party if any of the following applies: (A) the misappropriation claim is made in bath faith; (B) a motion to terminate an injunction is made or resisted in bad faith; or (C) willful and malicious misappropriation of trade secrets exists. R.C. 1333.64(A)-(C). The plain language of the statute makes no mention of attorney fees being contingent on a punitive damage award. *See Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 14 (attorney fee awards are distinct from punitive damages awards); *Atram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 392, 581 N.E.2d 1110 (8th Dist.1989) ("punitive damages need not actually be awarded before a court can award attorney fees").

{¶ 26} In this case, the trial court based its attorney fee award determination on R.C. 1333.64(C), not on the common law.   In finding that Hyde willfully misappropriated trade secrets, the trial court cited to evidence presented at trial, stating: "[W]illfulness cannot (and was not) disputed. Hyde took information related to Alegre's house accounts. The secret after-hours transmission of Alegre house account information, combined with the deletion of gigabytes of data from Alegre's server in an attempt to cover his tracks, was a violation of Plaintiffs' rights under R.C. 1333.61, et seq., and was also contrary to the NDA executed by Defendants." Trial Court's Findings of Fact and Conclusions of Law

at 8.

{¶ 27} The trial court also addressed R.C. 1333.64(C)'s malice requirement: "The manner in which Defendants misappropriated the trade secrets and the actions they took to conceal their efforts – not only at the time of the misappropriation, but also through their failure to exchange the comprehensive spreadsheets containing sensitive Alegre information during the pretrial discovery process – demonstrates a state of mind 'characterized by ill will or a spirit of revenge.' " Trial Court's Findings of Fact and Conclusions of Law at 8-9.

{¶ 28} Based on the above, we conclude that the trial court did not err in awarding statutory attorney fees to Alegre and DPA, as there did not need to be a nexus to a jury finding of punitive damages. Hyde and HCS, however, raise another issue regarding the attorney fee award: they argue that the amount granted by the trial court was arbitrary – the implication being, then, that it was an abuse of discretion.

{¶ 29} "When determining the amount of attorney fees, a trial court is guided by a two-step determination. The trial court should first calculate the 'lodestar' by multiplying the number of hours reasonably expended by a reasonable hourly rate and, second, decide whether to adjust that amount based on the reasonableness factors listed in Prof.Cond.R. 1.5(a)." *Miller,* 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, at ¶ 13; *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, ¶ 19. The factors include the required time and labor, the difficulty and novelty of the questions, the skill required to perform the services, and whether the fee was fixed or contingent. Prof.Cond.R. 1.5(a).

{¶ 30} Once the loadstar is established, a "trial court has discretion to modify the

presumptive calculation of an attorney-fee award[,] * * * but any modification must be accompanied by a rationale justifying the modification." *Phoenix Lighting Group* at ¶ 20.

{¶ 31} At the attorney fee hearing, counsel for Alegre and DPA presented evidence that they were entitled to attorney fees of $338,983.75 and secured an expert to testify that the amount was fair and reasonable in the southwest Ohio market considering the contentious nature of the case, extensive discovery, depositions taken, lengthy motion practice, and the week-long trial. Nevertheless, the trial court saw fit to deviate downward from the lodestar amount, reasoning:

> The court presided at the trial. The court had the opportunity to see the witnesses as they testified and hear the arguments of counsel. The court further had an opportunity to view the exhibits. The court does not believe the claims are inextricably intertwined. The court is of the view that 30% of the trial time and its related preparation was devoted to the appropriation of trade secrets issue. The Plaintiffs prevailed on two (2) of five (5) claims they made in this case. The court awards Plaintiffs' attorneys' fees in the amount of $110,000 in this matter.

Trial Court's Findings of Fact and Conclusions of Law at 10.

{¶ 32} Based on the record before us, we cannot say that the trial court abused its discretion in awarding $110,000 in attorney fees. The trial court oversaw the litigation from beginning to end, from complaint to jury verdict, over the course of nearly three years, and had a far better opportunity to evaluate the worth of services provided by the lawyers in this case than we do as the reviewing court. And while the court below could have been more precise in its explanation of how it reached $110,000, that award certainly does not

rise to the level of being arbitrary, unreasonable, or unconscionable.

{¶ 33} The second assignment of error is overruled.

### IV.    Conclusion

{¶ 34} Having overruled both assignments of error, the judgment of the trial court will be affirmed.

. . . . . . . . . . . .

WELBAUM, J., concurs.

TUCKER, P.J., concurs:

{¶ 35} Though I concur in the majority opinion, I write separately to discuss *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. Mfg., Inc.*, N.D.Ohio No. 4:06-CV-114, 2010 WL 4818367 (the district court decision) and the appellate court decision in the same case, 511 F.Appx. 398 (6th Cir.2013).   The *Allied* litigation included, among other causes of action, a Uniform Trade Secrets Act claim under R.C. 1333.61 et seq.   Under R.C. 1333.63(A), the jury in that case awarded Allied unjust enrichment damages in excess of three million dollars but, under R.C. 1333.63(B), the jury did not award Allied punitive damages.   As here, despite the jury's failure to award punitive damages, Genesis requested attorney fees under R.C. 1333.61(C), which states that the court may award attorney fees if "[w]illful and malicious misappropriation exists."   The district court declined to award attorney fees, stating:

> As [Genesis] point[s] out, the finding required for an award of
> attorneys' fees under § 1333.64(C) mirrors that required for an award of
> punitive damages under § 1333.63(B).   Both sections mandate a finding of
> "willful and malicious misappropriation."   *See* O.R.C. §§ 1333.63(B) and

1333.63(C). [Allied's] attempts to distinguish the two are unclear and illogical. While the question of attorneys' fees is one for the Court, whereas a jury may determine a punitive damage award, the finding required for each is the same.

> The question of whether attorneys' fees are appropriate is left to the discretion of the Court. *See* O.R.C. § 1333.64. Based upon the jury's verdict with respect to punitive damages, and taking into account all of the evidence presented, the Court finds that [Allied has] failed to show that [Genesis] acted willfully and maliciously in misappropriating Allied's trade secrets. Therefore, [Allied's] Motion to Mold Verdict for Attorneys' Fees is hereby DENIED.

*Allied Erecting,* N.D.Ohio No. 4:06-CV-114, 2010 WL 4818367, at *28-29. The district court found Allied's argument in support of attorney fees "illogical," with Allied's argument being as follows:

> * * * Although the jury found that Genesis was not liable for punitive damages, in so doing the jury did not specifically determine the separate issue of whether or not Genesis's misappropriation was willful and/or malicious, which is an issue for the Court.

*Id.* at *27, fn.5. Allied's argument, which the district court found illogical, was similar, if not identical, to Alegre's argument in the pending case.

{¶ 36} On appeal, the Sixth Circuit affirmed the district court's attorney fee determination, concluding as follows:

> * * * The [Uniform Trade Secrets Act] allows the district court to award

attorneys' fees upon a finding of "willful and malicious misappropriation."

§ 1333.64(C). Because the jury reasonably found that Genesis did not act willfully or maliciously, Allied is not entitled to fees.

*Allied Erecting,* 511 F.Appx. at 409.

**{¶ 37}** Not surprisingly, HCS and Hyde, in reliance upon the decisions in *Allied Erecting*, assert that since an award of punitive damages under R.C. 1333.63(B) and an award of attorney fees under R.C. 1333.64(C) both require a finding of willful and malicious misappropriation, the jury's failure to award punitive damages precluded an award of attorney fees under R.C. 1333.64(C). At first blush, this argument has merit in light of the *Allied* decisions, but it fails to take into consideration the difference between the burden of proof for punitive damages and the burden of proof for statutory attorney fees.

**{¶ 38}** In the pending case, the jury was properly instructed that in order to recover punitive damages, the willful and malicious misappropriation had to be proven by clear and convincing evidence. *Maggard v. Pemberton*, 2008-Ohio-4735, 178 N.E.3d 328, ¶ 12 (2d Dist.), citing R.C. 2315.21(D)(4); *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). In contrast, R.C. 1333.64 is silent regarding the moving party's burden of proof when seeking statutory attorney fees. "When a statute is silent regarding the appropriate burden of proof, [it is] infer[ed] that the common preponderance-of-the evidence standard applies." (Citations omitted.) *Wilson v. Ward*, 183 Ohio App.3d 494, 2009-Ohio-2078, 917 N.E.2d 821, ¶ 11 (9th Dist.).

**{¶ 39}** Based upon R.C. 1333.64's silence regarding the burden of proof, I conclude that Alegre had only to convince the trial court by the preponderance of the

evidence that Hyde and HCS had acted willfully and maliciously when misappropriating Alegre's trade secrets in order to recover statutory attorney fees. Under a preponderance of the evidence standard, there was certainly sufficient evidence to sustain the trial court's conclusion that HCS and Hyde's trade secret misappropriation was willful and malicious. With these additional thoughts, I fully concur in the majority opinion.

Copies sent to:

Scott K. Jones
Daniel J. Knecht
Craig T. Matthews
Brooke F. Poling
Hon. Timothy N. O'Connell